1999-NMSC-038

991 P.2d 477

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Curtis COFFIN, Defendant–Appellant.**

**No. 23,815.**

Supreme Court of New Mexico.

Oct. 6, 1999.

Phyllis H. Subin, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, for Appellant.

Patricia A. Madrid, Attorney General, M. Victoria Wilson, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

SERNA, Justice.

{1} Defendant Curtis Coffin appeals his convictions of first degree murder, voluntary manslaughter, and bribery of a witness. Coffin contends that the trial court erred in refusing jury instructions that would have elaborated on his claim of self-defense and provocation. He also contends that the trial court's response to a jury question concerning premeditation caused jury confusion with respect to the statutorily defined mens rea for the crime of first degree murder. Additionally, Coffin claims that the trial court erred in excluding some of the evidence he offered at trial and in admitting other evidence offered by the State. Coffin further raises several challenges relating to the seek-

ing of the death penalty by the State in this case, even though the jury did not impose a sentence of death. Coffin also claims that the State's late filing of notice of intent to seek the death penalty caused a delay in the commencement of trial that violated his right to a speedy trial. Finally, Coffin contends that there is insufficient evidence in the record to support his first degree murder and bribery of a witness convictions. We conclude that Coffin's arguments are without merit and therefore affirm his convictions.

### I. Facts

{2} On March 8, 1995, Coffin and several of his friends, Ralph Gutierrez, John Saldana, and Deanda Montoya, spent the evening driving around Albuquerque in a mini-van belonging to Coffin's father, and drinking beer purchased earlier in the evening at Sal's Discount Liquors. At one point, while in a field, John Saldana asked Coffin if he could fire his pistol, a .22 caliber Beretta, and after Coffin agreed, Saldana fired several shots out of the window of the mini-van. Once the group finished the beer purchased earlier in the evening, they returned to Sal's to buy more.

{3} Coffin parked his mini-van in the parking lot at Sal's near the liquor store entrance. Ralph Gutierrez went inside the bar portion of Sal's to use the phone and the restroom, while John Saldana walked up to the liquor store to buy more alcohol. Upon finding the door to the liquor store locked, Saldana walked around to the drive-up window where a number of cars waited in line. The drive-up window attendant, David Fresquez, told Saldana to go back around to the door to the liquor store, which Fresquez would unlock, because the two men in the car next in line, Chris Charles Martinez (Chris Martinez, Sr.) and Chris Alfred Martinez (Chris Martinez, Jr.), were giving Saldana dirty looks. Chris Martinez, Jr. was associated with the Lomas Trece gang, and Coffin, Gutierrez, and Saldana belonged to a rival gang, Los Carnales Locos (LCL), which claimed an area of Albuquerque that included Sal's. Chris Martinez, Jr. and Saldana had worked at the same restaurant. Saldana went inside the package liquor store as Fres-

quez had suggested, and Fresquez returned to selling liquor at the drive-up window.

{4} While Saldana and Gutierrez were still inside Sal's, the Martinezes, after their purchase at the drive-up window, drove through the parking lot near Coffin's mini-van. The Martinezes stopped their car in the middle of the parking lot and got out, leaving the doors open and the lights of the car on. Coffin also exited his vehicle, and an altercation ensued.

{5} Coffin testified that his friend Ronnie Contreras was standing by his mini-van and that the Martinezes called Ronnie by name and approached him in an aggressive manner. Coffin testified that, after he reassured Ronnie that he would not let the Martinezes "jump" him, Chris Martinez, Sr. approached Coffin, and Coffin thought there would be a fight with him against the father and Ronnie against the son. At that point, according to Coffin, he saw Chris Martinez, Sr. reach in his pocket for a weapon. As a result, Coffin pulled out his gun and told the Martinezes to get back in their car. Coffin testified that Chris Martinez, Jr. braced his father with his arm and, although the father did not seem to care about Coffin's gun, they turned back toward their car. According to Coffin's testimony, after Coffin started to return to his mini-van, the Martinezes then turned back around and approached him in an aggressive manner. Coffin testified that he "was afraid of getting attacked, possibly dead" and that, because his earlier attempt to break up the fight had failed, he "panicked" and started firing his gun at "pretty much both of them." Following the shooting, Coffin drove away from Sal's in the mini-van with Deanda Montoya and Gutierrez, the latter of whom had exited Sal's immediately after the shots were fired.

{6} Other witnesses told somewhat different versions of the altercation between Coffin and the Martinezes. Leo Gonzales, who was sitting in a truck in the parking lot, testified that Coffin was near his mini-van with Ronnie Contreras. The Martinezes pulled up in the parking lot near Coffin's mini-van, and after Chris Martinez, Jr. got out of his car, he and Coffin started arguing. Leo Gonzales testified that Coffin was shout-

ing and that Chris Martinez, Jr. tried to stop the argument by putting up his hand and saying, "It's cool man." Gonzales testified that Chris Martinez, Jr. did not appear to be acting in a threatening manner. During the argument, Chris Martinez, Sr. got out of his car, and according to Gonzales, "that's when it got worse." As Chris Martinez, Sr. joined the argument, he was walking in an aggressive manner, and Coffin pulled out his gun and fired several shots. Gonzales testified that, after hearing the first shot, he directed his attention to trying to get his companion, Johnny Lucero, to drive away from Sal's, but Gonzales looked back in the side mirror on the passenger side of Lucero's truck and saw Coffin pointing his gun at the ground while he continued to fire.

{7} According to Deanda Montoya, who was in the back of the mini-van during the entire incident, there was nobody else outside the van after Gutierrez and Saldana went inside Sal's and nobody yelled out Ronnie Contreras's name. After Coffin got out of the van, Montoya did not pay attention to what was happening until she heard a gunshot. At that point, she looked outside the van and saw one person lying on the ground and another standing. Coffin told the man who was standing to get back into his car, and as the man started to turn around to return to the car, Coffin shot him more than once and shot him again after he fell to the ground.

{8} The police arrived at Sal's to find two bodies, both lying on their back. Emergency personnel attempted to resuscitate Chris Martinez, Sr. and transported him to the hospital, where he was pronounced dead after about twenty minutes of life-saving efforts. Medical personnel pronounced Chris Martinez, Jr. dead at the scene. Near the location where the police discovered Chris Martinez, Sr., the police found a small pocket knife, opened, lying on the ground. Doctor Julia Goodin, the forensic pathologist who performed the autopsies on both Martinezes, testified at trial concerning their gunshot wounds. Chris Martinez, Sr. received two gunshot wounds, one on the left side of the head near the ear, traveling slightly front to back and left to right and lodging at the base

of the skull and brain. The second gunshot wound was in the left chest area near the armpit, traveling right to left. Mr. Martinez, Sr. had a blood alcohol level of .269 percent. Chris Martinez, Jr. received four gunshot wounds: one to the left side of the jaw traveling slightly left to right and back to front, exiting through the chin; a second behind the left ear, traveling left to right and back to front, lodging in the base of the skull; a third just below the latter gunshot behind the left ear, with a similar trajectory; and, finally, a fourth in the lower middle of the back, traveling left to right and back to front, hitting the spine. Mr. Martinez, Jr. had a blood alcohol level of .156 percent.

{9} At trial, Coffin attempted to portray the fight as gang-related as early as his opening statement. Following the presentation of evidence, Coffin argued that he acted in self-defense or with sufficient provocation to constitute voluntary manslaughter. Finally, Coffin argued that there was no evidence of premeditation. The jury convicted Coffin of the first degree murder of Chris Martinez, Jr., the voluntary manslaughter of Chris Martinez, Sr., and bribery of a witness. Coffin challenges each of these convictions on appeal.

## II. Instructions to the Jury

{10} Coffin contends that the trial court erred in refusing three of his requested jury instructions dealing with the issues of self-defense and provocation. Additionally, Coffin claims that the trial court's response to the jury's inquiry about premeditation irreparably confused the elements of first degree murder. For the following reasons, we conclude that the trial court properly instructed the jury and did not err in its response to the jury's question concerning premeditation.

### A. Requested Instruction on Self–Defense Against an Accessory

{11} Coffin testified that he saw Chris Martinez, Sr. reaching for a weapon, and a knife was later found near Chris Martinez, Sr.'s body. In addition, Coffin established that Chris Martinez, Jr. was not wearing a shirt even though it was a relatively cold night, which, according to Coffin, indi-

cated an aggressive posture. Finally, Coffin claimed that both men came at him in an aggressive manner after he brandished his gun to try to stop the fight. As a result, the trial court instructed the jury in accordance with the Uniform Jury Instruction on self-defense. *See* UJI 14–5171 NMRA 1999.

Evidence has been presented that Curtis Coffin killed Chris Charles Martinez and Chris Alfred Martinez while defending himself.

The killing is in self-defense if:

1. There was an appearance of immediate danger of death or great bodily harm to Curtis Coffin as a result of being approached by the two Martinezes; the father holding a knife and the son having taken his shirt off.

2. Mr. Coffin was in fact put in fear by the apparent danger of immediate death or great bodily harm and killed Chris Charles Martinez and or Chris Alfred Martinez because of that fear; and

3. A reasonable person in the same circumstances as Mr. Coffin would have acted as he did.

The burden is on the state to prove beyond a reasonable doubt that a defendant did not act in self-defense. In considering this defense, and after considering all the evidence in the case, if you have a reasonable doubt as to Mr. Coffin's guilt, you must find him not guilty.

Coffin, drawing an analogy to accomplice liability and the Uniform Jury Instruction on aiding and abetting a crime, *see* UJI 14–2822 NMRA 1999, also requested that the trial court give the following jury instruction:

A person may defend himself against another, even though that person himself did not do the acts justifying the defense if:

1. That person intended that the attack be committed;

2. The attack was committed;

3. The person helped, encouraged, or caused the attack to be committed.

Coffin argues that the trial court's refusal to give this instruction in conjunction with the instruction on self-defense constitutes reversible error. We disagree.

{12} The purpose of recognizing self-defense as a complete justification to homicide is the reasonable belief in the necessity for the use of deadly force to repel an attack in order to save oneself or another from death or great bodily harm. *See State v. Melendez*, 97 N.M. 738, 740, 643 P.2d 607, 609 (1982) ("Self-defense is a belief by a *reasonable [person]* in the necessity to save himself [or herself] from death or great bodily harm."); *State v. Reneau*, 111 N.M. 217, 219, 804 P.2d 408, 410 (Ct.App.1990) ("The inquiry in a self-defense claim focuses on the reasonableness of defendant's belief as to the apparent necessity for the force used to repel an attack."). Because self-defense is defined by the objectively reasonable necessity of the action, the defense obviously does not extend to a defendant's acts of retaliation for another's involvement in a crime against him or her. *See State v. Pruett*, 24 N.M. 68, 73, 172 P. 1044, 1046 (1918) (affirming the trial court's use of a jury instruction containing the "familiar and oft-approved statement that the law of self-defense does not imply the right to attack, nor will it permit acts done in retaliation for revenge"); *cf. State v. Duarte*, 1996–NMCA–038, ¶ 8, 121 N.M. 553, 915 P.2d 309 (stating that under New Mexico law "there must have been some evidence that an objectively reasonable person, put into Defendant's subjective situation, would have thought that [the individual whom the defendant sought to protect] was threatened with death or great bodily harm, and that *the use of deadly force was necessary to prevent the threatened injury*" (emphasis added)). While it is true that a person may act in self-defense against multiple attackers acting in concert, this principle applies only to the extent that each accomplice poses an immediate danger of death or great bodily harm, thereby necessitating an act of self-defense. *See People v. Johnson*, 112 Mich.App. 483, 316 N.W.2d 247, 249–50 (1982) ("This principle does not give a defendant *carte blanche* to kill anybody who is marginally associated with the alleged assailant."). Coffin's tendered instruction would have allowed a claim of self-defense against an accomplice to an attacker despite the fact that the accomplice posed no immediate danger of death or great

bodily harm and despite a lack of necessity for the actions against the accomplice. Therefore, Coffin's instruction is contrary to the law of New Mexico regarding self-defense, and the trial court properly denied Coffin's request to so instruct the jury.

{13} The instruction given by the trial court fully conveyed Coffin's defense to the jury. Coffin argued that both Martinezes posed an immediate threat of death or great bodily harm, that he feared death or great bodily harm and shot them as a result, and that he acted as a reasonable person would have acted in the same circumstances. The jury instruction on self-defense in this case included both of the Martinezes and their alleged threatening actions and, thus, accurately and adequately reflected Coffin's argument. The State introduced evidence from which the jury could infer that either one or both of the Martinezes did not pose an immediate danger of death or great bodily harm, that Coffin's shooting of Chris Martinez, Jr. was not the result of Coffin's fear of death or great bodily harm, or that a reasonable person under the same circumstances would not have acted as Coffin did. The jury verdict indicates that the jury accepted one or more of these factual interpretations and rejected Coffin's argument to the contrary. We conclude that Coffin's argument that the self-defense instruction failed to adequately account for the alleged concerted action of the Martinezes is without merit.

**B. Requested Instruction on the Standard with which to View the Defendant's Actions**

{14} Coffin also requested that the trial court give the following instruction to the jury relating to his claim of self-defense: "An accused's actions are to be viewed from the standpoint of a person whose mental and physical characteristics are like the accused's and who sees what the accused sees and knows what the accused knows." Coffin contends his requested instruction is an accurate statement of the law because it is simply a verbatim recitation of the standard articulated by the Court of Appeals in *State v. Gallegos*, 104 N.M. 247, 249, 719 P.2d 1268, 1270 (Ct.App.1986), *abrogated in part on other*

*grounds by State v. Alberico*, 116 N.M. 156, 167, 861 P.2d 192, 203 (1993). Additionally, Coffin claims that he is "entitled to instructions on his theories of the case that are supported by the evidence," *State v. Chamberlain*, 112 N.M. 723, 728, 819 P.2d 673, 678 (1991), and that the trial court therefore erred in denying the instruction. We have previously rejected a similar argument, *see* *State v. Vigil*, 110 N.M. 254, 257, 794 P.2d 728, 731 (1990), and for the following two reasons, we reject Coffin's argument as well.

{15} First, Coffin misapplies *Gallegos*. As indicated by the self-defense instruction given to the jury in this case, we have established three requirements for self-defense in New Mexico: "(1) an appearance of immediate danger of death or great bodily harm to the defendant, (2) the defendant was in fact put in fear by the apparent danger, and (3) a reasonable person in the same circumstances would have reacted similarly." *State v. Abeyta*, 120 N.M. 233, 239, 901 P.2d 164, 170 (1995), *abrogated on other grounds by State v. Campos*, 1996–NMSC–043, n. 4, 122 N.M. 148, 921 P.2d 1266. The first two requirements, the appearance of immediate danger and actual fear, are subjective in that they focus on the perception of the defendant at the time of the incident. By contrast, the third requirement is objective in that it focuses on the hypothetical behavior of a reasonable person acting under the same circumstances as the defendant. "Thus, ours is a hybrid test, combining both, the subjective and the objective, standards...." *Gallegos*, 104 N.M. at 250, 719 P.2d at 1271.

{16}. Coffin's proffered instruction quotes language from *Gallegos* that the Court of Appeals used to describe the subjective standard applicable to the first requirement of self-defense that there be the appearance of immediate danger of death or great bodily harm to the defendant. *See Gallegos*, 104 N.M. at 249, 719 P.2d at 1270. The Court of Appeals did not use this language to describe the objective requirement of self-defense. This language; if applied to the third requirement of self-defense, whether a reasonable person would have acted similarly, would nullify the objective aspect of the law of self-defense in New Mexico. Therefore, because

we believe that Coffin's instruction would have unduly confused the jury with respect to the combined subjective/objective nature of self-defense, we conclude that the trial court properly denied Coffin's requested instruction.

■ {17} Second, Coffin's requested jury instruction represents an amplification of the first element articulated in the self-defense instruction given. While it is true that a defendant is entitled to instructions on defense theories supported by the evidence, *see Chamberlain,* 112 N.M. at 728, 819 P.2d at 678, it is error to refuse a requested instruction defining or amplifying an element only if "the element was not adequately covered by the instructions given." *State v. Mankiller,* 104 N.M. 461, 468, 722 P.2d 1183, 1190 (Ct. App.1986) (discussing additional considerations for assessing error in such instances), *see State v. Magby,* 1998–NMSC–042, ¶¶ 15–16, 126 N.M. 361, 969 P.2d 965 (concluding that the trial court erred in refusing a requested instruction defining "reckless disregard" due to the ambiguity of the phrase in the instruction given). In this case, the self-defense instruction adequately informed the jury that the first requirement of self-defense, an appearance of immediate danger of death or great bodily harm to the defendant, was based on Coffin's subjective assessment of the incident. *See Vigil,* 110 N.M. at 257, 794 P.2d at 731 (concluding that the trial court's refusal to give a similar requested instruction concerning subjective factors to be considered by the jury did not constitute error because the self-defense instruction "adequately explained the law to be applied in this case"). Therefore, the trial court did not err in refusing to give Coffin's requested amplification of the first requirement of self-defense.

## C. Requested Instruction on Transferred Intent for Voluntary Manslaughter

{18} Coffin also contends that the trial court erred in refusing to instruct the jury on transferred intent with respect to the charge of voluntary manslaughter. Specifically, Coffin submitted the following instruction to the trial court:

When one intends to kill or injure a certain person, and by mistake or accident kills a different person, the crime, if any, is the same as though the original intended victim had been killed. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

*See* UJI 14–255 NMRA 1999. The use note to UJI 14–255 indicates that this instruction is not to be given if the victim died as a result of "first degree murder by a deliberate design to effect the death of any human being" because that situation is adequately addressed by a different jury instruction, *see* UJI 14–201 use note 2 NMRA 1999. The committee commentary to UJI 14–255 indicates that the instruction is instead to be used in other instances of first degree murder or for second degree murder, but the commentary does not mention . voluntary manslaughter.

■ {19} Drawing an analogy to the principle that, "where an innocent bystander is accidentally killed during the attempt to defend oneself, the doctrine of self-defense provides a defense against the unintended killing," *Abeyta,* 120 N.M. at 243, 901 P.2d at 174, Coffin apparently intended to give this instruction to the jury in an attempt to transfer the alleged provocation of Chris Martinez, Sr. to his act of killing Chris Martinez, Jr. As we noted in *Abeyta,* the Court of Appeals has held that "one may not transfer 'one's passion from the object of the passion to a related bystander.'" *Abeyta,* 120 N.M. at 243, 901 P.2d at 174 (quoting *State v. Gutierrez,* 88 N.M. 448, 451, 541 P.2d 628, 631 (Ct.App.1975)). Coffin, however, contends that our opinion in *State v. Griego,* 61 N.M. 42, 294 P.2d 282 (1956), stands for the principle that transferred intent applies to voluntary manslaughter. *See generally* 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 3.12(d), at 402 (1986) ("[I]f A aims at B with intent to kill under circumstances which would make him guilty of voluntary manslaughter of B, but he hits and [accidentally] kills C instead, A is guilty of voluntary manslaughter of C."). We note that *Griego* dealt with the question of sufficiency of the evidence to support a conviction ·of voluntary manslaughter, not

with a requested instruction on transferred intent. *Griego*, 61 N.M. at 44–45, 294 P.2d at 283. Nevertheless, it is unnecessary for us to decide in this case whether the Court of Appeals' conclusion in *Gutierrez* conflicts with our prior holding in *Griego* or whether the partial excuse of sufficient provocation may be transferred from the source or cause of the relevant extreme emotion to an accidentally killed innocent bystander. There is no evidence in this case suggesting that Coffin accidentally killed either Chris Martinez, Sr. or Chris Martinez, Jr.

{20} Three people testified that they directly observed the shooting: Coffin, Deanda Montoya, and Leo Gonzales. Coffin testified that, after he told the Martinezes to return to their car and they began to do so, both of them came at him, and he aimed his gun at "pretty much both of them." Deanda Montoya testified that after she heard the first gunshot she saw Coffin tell a man without a shirt, presumably Chris Martinez, Jr. based on other testimony, to return to his car and that as he did so Coffin shot him. Montoya also testified that, after Coffin shot Chris Martinez, Jr. a couple of times, Coffin walked closer and shot him while he was on the ground. Leo Gonzales testified that he saw Coffin fire his gun toward the ground. Finally, John Saldana testified that Coffin told him that he shot Chris Martinez, Jr. because he was a witness to the crime, though Saldana qualified this testimony on cross-examination by saying that he was unsure whether Coffin or someone else had made that statement. None of this testimony supports a view of the evidence that Coffin killed either of the Martinezes by accident. Therefore, to the extent that Coffin attempted to inject the issue of transferred provocation into this case, the trial court properly refused his requested instruction.[1]

---

1. To the extent that Coffin may also be claiming that he offered this instruction for purposes of applying self-defense to an innocent bystander, we do not require any instruction on this principle beyond the general self-defense instruction. *See* UJI 14–5171 NMRA 1999 committee commentary ("The instruction does not require a separate instruction in the event the victim is an innocent bystander, i.e., a person who did not instigate the action which required the de-

fense."). *See generally State v. McCrary*, 100 N.M. 671, 673, 675 P.2d 120, 122 (1984) ("The committee commentary is persuasive authority, although it is not binding on this Court."). In any case, consistent with our analysis regarding transferred provocation, the absence of any evidence supporting a theory of accidental shooting would render such an argument inappropriate in the context of Coffin's claim of self-defense.

{21} Further, Coffin's requested instruction contained the principle of transferred intent, not transferred provocation. In this regard, Coffin's instruction, instead of supporting his apparent theory, would have been beneficial to the State, and the trial court's refusal to give the instruction could not have harmed Coffin. *See State v. Fekete*, 120 N.M. 290, 296, 901 P.2d 708, 714 (1995) ("The doctrine of transferred intent is a legal fiction that is used to hold a defendant criminally liable to the full extent of his or her criminal culpability."); *People v. Czahara*, 203 Cal.App.3d 1468, 250 Cal.Rptr. 836, 838–39 (1988) (stating that "[t]he transferred intent rule serves to ensure that [a defendant] is punished to the full extent of his [or her] culpability" and stating that the transferred intent rule is inapplicable if the intended victim is killed because the killer's punishment can be commensurate to his or her full culpability without the concept of transferred intent); *Juarez v. State*, 886 S.W.2d 511, 514 (Tex.App.1994) ("The doctrine of transferred intent serves to *expand* a defendant's liability when an act has an unexpected consequence." (emphasis added)). Thus, even if there had been error in refusing this instruction, it would have been harmless. *See Juarez*, 886 S.W.2d at 514.

## D. The Trial Court's Response to a Jury Question Regarding Premeditation

{22} The Legislature has defined the crime of first degree murder as, *inter alia*, "the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused … by any kind of willful, deliberate and premeditated killing…." Section 30–2–1. The trial court instructed the jury on the crime of first degree willful, deliberate, and premeditated murder, in accordance with our Uniform Jury Instructions, as follows:

For you to find the defendant guilty of first degree murder by a deliberate killing as charged in Count 1, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendant killed CHRIS ALFRED MARTINEZ;

2. The killing was with the *deliberate intention* to take away the life of CHRIS ALFRED MARTINEZ or any other human being;

3. The defendant did not act in defense of himself or another;

4. This happened in New Mexico on or about the 8th day of March, 1995.

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. *The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action.* A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. *To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.*

(Emphasis added.); *see* UJI 14–201 NMRA 1999. During deliberations, the jury posed the following question to the trial court: "Does premeditation belong in this case or are we even to consider premeditation?" The State proposed to respond, "The elements to be considered are only those contained in the written instructions you have been given." The defense proposed an alternative response: "The word 'deliberation' is used in the instructions instead of premeditation." During an extended discussion with the trial court, defense counsel theorized that the jury's question reflected confusion about the meaning of the word "deliberation," probably in response to the reference to the word "premeditation" during voir dire and the jury's probable expectation that it would appear in the instructions. Defense counsel explained that, although "[w]e all understand that deliberation equals premeditation," the jury did not, and according to defense counsel, the proposed response would "clear[ ] up for [the jury] that deliberation is the same thing as premeditation." The trial court told defense counsel, "I understand your point. I don't think you could argue it any more clear than you have. I know what you want from me." The trial court then crafted the following response: "The instructions refer to deliberation not premeditation. The elements to be considered are only those contained in the written instructions you have been given."

 {23} Coffin now claims that the trial court's response removed the statutory element of premeditation from the crime of first degree murder. The trial court's response was clearly an attempt to combine the proposed requests from the State and the defense. The trial court apparently accepted Coffin's argument and attempted to respond to the jury in accordance with his request. Although Coffin now claims that the phrase "deliberation not premeditation," as opposed to "deliberation instead of premeditation," significantly altered the proposed response from defense counsel and confused the jury, defense counsel, when asked by the trial court if there was anything further for the record, did not object to the trial court's proposed response, despite the clear indication by the trial court that the defense's request was understood and seemingly accepted. It was incumbent upon Coffin to alert the trial court to the claimed error and to the significance of any deviation from the requested response in order to allow the trial court the opportunity to remedy any potential error. By his failure to do so, we conclude that Coffin did not preserve this argument for appeal, and we limit our review to fundamental error. *See* Rule 12–216 NMRA 1999, *Madrid v. Roybal,* 112 N.M. 354, 356, 815 P.2d 650, 652 (Ct.App.1991) ("The principal purpose of the rule requiring a party to preserve error in the trial court is to alert the mind of the trial judge to the claimed error and to accord the trial court an opportunity to correct the matter."). "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the

conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Orosco*, 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992).

{24} Coffin does not claim that UJI 14–201 inadequately explains the proper mens rea for first degree willful, deliberate, and premeditated murder. Instead, he asserts that the trial court's response confused the jury by making it appear that premeditation is not an element of the crime. Based on precedent from this Court and our interpretation of legislative intent, we disagree.

{25} The history of first degree murder in New Mexico clearly demonstrates that the concept of premeditation is subsumed within the meaning of "deliberate intention." In *State v. Smith*, 26 N.M. 482, 487–94, 194 P. 869, 870–73 (1921), this Court interpreted a statutory scheme defining murder as "the unlawful killing of a human being, with malice aforethought, either express or implied," 1891 N.M.Laws ch. 80, § 1, defining express malice as "that deliberate intention, unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof," 1891 N.M.Laws ch. 80, § 2, defining first degree murder as "[a]ll murder which shall be perpetrated by means of poison or lying in wait, torture, or by any kind of wilful, deliberate and premeditated killing, ... or perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of any human being," 1907 N.M.Laws ch. 36, § 1, and defining second degree murder as any murder not constituting first degree murder, *id.* We held, in accordance with the statute, that the Legislature intended that both first degree murder and second degree murder require malice aforethought. *Smith*, 26 N.M. at 491, 194 P. at 872. We also determined that "afore-thought" is "an exact synonym for 'premeditation.'" *Smith*, 26 N.M. at 491, 194 P. at 872. With respect to "deliberate intention," however, even though the Legislature had used the phrase in the definition of express malice for murder in general, we concluded that the Legislature intended to set apart the type of "intensified or first degree malice" signaled by a "deliberate intent to take away

the life of a fellow creature." *Smith*, 26 N.M. at 491, 194 P. at 872. Thus, although first degree murder and second degree murder shared the element of premeditated malice, we concluded that the Legislature intended to distinguish first degree murder from second degree murder by the element of a deliberate intent to kill, defined as "a thinking over with calm and reflecting mind to do the fatal act." *Smith*, 26 N.M. at 491, 194 P. at 872 ("In all cases of murder then we have premeditated malice. The statute defining express malice adds to premeditated malice an additional mental state, viz. deliberation; that is to say, there is not only premeditated malice present, but it is accompanied by a deliberation—that is, a thinking over with calm and reflective mind—to do the fatal act."). Because " '[p]remeditation' means nothing more nor less than thought of beforehand," *Smith*, 26 N.M. at 491, 194 P. at 872, we necessarily concluded that the existence of a deliberate intention to kill will include premeditation. *See Torres v. State*, 39 N.M. 191, 195, 43 P.2d 929, 931 (1935) ("Deliberation is more than mere premeditation and is the distinguishing characteristic of first degree murder."); *see also State v. Garcia*, 114 N.M. 269, 271, 837 P.2d 862, 864 (1992) ("The courts of this state have construed [the statutory definition of first degree murder as any kind of willful, deliberate and premeditated killing] to mean a killing with the deliberate intention to take away the life of another." (internal quotation marks and citation omitted)). *See generally Black's Law Dictionary* 427 (6th ed.1990) (defining "deliberately" as "with premeditation").

{26} Against the backdrop of our construction of first degree murder in *Smith*, the Legislature, in 1963, repealed the murder statutes at issue in *Smith*, 1963 N.M.Laws, ch. 303, § 30–1, and enacted a new murder statute, 1963 N.M.Laws, ch. 303, § 2–1. The 1963 enactment, though somewhat altered in form, contained a substantially similar definition of the requisite mens rea for first degree murder:

> Murder is the unlawful killing of one human being by another with malice aforethought, either express or implied, by any

of the means with which death may be caused.

A. Murder in the first degree consists of all murder perpetrated:

(1) by any kind of wilful, deliberate and premeditated killing;

(2) by means of poison, lying in wait or torture;

. . .

(5) from a deliberate and premeditated design unlawfully and maliciously to effect the death of any human being.

1963 N.M.Laws, ch. 303, § 2–1. Once again, the Legislature defined second degree murder as any murder not constituting first degree murder. *Id.* § 2–1(B). Thus, the Legislature's definition of the mens rea for the applicable form of first degree murder, "wilful, deliberate and premeditated," did not change from the statute interpreted in *Smith.* As a result, we presume that the Legislature approved of our prior construction of the crime of first degree murder and the significance of deliberate intent. *See* 2A Norman J. Singer, *Statutes and Statutory Construction* § 45.12, at 62–63 (5th ed. 1992) ("[I]f [a] court interprets a statute and the legislature fails to take action to change that interpretation, it is presumed that the legislature has acquiesced in the court's interpretation.").

{27} The Legislature again revisited the murder statute in 1980, 1980 N.M.Laws, ch. 21, § 1, and established the present definition of first degree murder applicable in this case. *See* Section 30–2–1. For the second time, the Legislature chose not to alter the mens rea description of the applicable form of first degree murder, though it did expand the mens rea for second degree murder, *see Garcia,* 114 N.M. at 272–73, 837 P.2d at 865–66. The mens rea for the type of first degree murder of which the jury convicted Coffin remains as it was when first enacted in 1907: a killing that is willful, deliberate and premeditated. Thus, we apply the construction of this language from our earlier cases.

{28} The instruction on first degree murder given by the trial court explained to the jury that a deliberate intent is one that is "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action" and cautioned the jury that "the slayer must weigh and consider the question of killing and his reasons for and against such a choice." Based on the precedent of this Court and rules of statutory construction, we conclude that the word "deliberation" as used in the trial court's response to the jury and the phrase "deliberate intention" as defined in UJI 14–201 subsumes the statutory concept of premeditation. *Cf. Garcia,* 114 N.M. at 273, 837 P.2d at 866 (1992) ("When the legislature amended the Criminal Code in 1980 to redefine the offenses of first and second degree murder as set out in Section 30–2–1, it did so against the background of cases holding that intentional killings were embraced within second degree murder. The legislature also had, as background, the benefit of our uniform jury instruction defining 'deliberate intention' in the same terms, verbatim, as are now contained in UJI 14–201." (footnote omitted)).

{29} With this construction of first degree willful, deliberate and premeditated murder in mind, we believe that the trial court should have responded to the jury's question by instructing the jury that deliberation *includes* premeditation. The trial court wrongly told the jury that the jury instruction refers to deliberation *not* premeditation, and we caution trial courts faced with similar jury questions in the future to craft a response consistent with this opinion. Nevertheless, a deliberate intention is the defining characteristic of the requisite mental state for this form of first degree murder. *See Garcia,* 114 N.M. at 273, 837 P.2d at 866 ("We think it reasonable, therefore, to conclude that the legislature intended to exclude from second degree murder the element of deliberation but not to exclude otherwise intentional killings from that crime."). Further, the definition of "deliberate intention" in UJI 14–201 substantially conforms to our interpretation in *Smith* of the statutory phrase "wilful, deliberate and premeditated," and is an exceedingly clear, unambiguous explanation of the proper mens rea for first degree murder in New Mexico. *See State v.*

*Noble,* 90 N.M. 360, 365, 563 P.2d 1153, 1158 (1977) (stating that the description of deliberate intention in the jury instruction "is clear, unambiguous and remarkably free of 'legalese'"). Viewing the response to the jury in context with the jury instruction itself, we determine that the response could not have caused confusion or created ambiguity concerning the requisite mens rea for first degree willful, deliberate, and premeditated murder under Section 30-2-1. *Cf. State v. Parish,* 118 N.M. 39, 41–42, 878 P.2d 988, 990–91 (1994) (stating that an apparently defective jury instruction "when considered in the context of other instructions given to the jury ... may 'fairly and accurately state the applicable law'" and that "if a jury instruction is capable of more than one interpretation, then the court must next evaluate whether another part of the jury instructions satisfactorily cures the ambiguity" (quoting *State v. Hamilton,* 89 N.M. 746, 750, 557 P.2d 1095, 1099 (1976))). Thus, we conclude that the trial court's response to the jury, though deficient, did not constitute error and, therefore, did not rise to the level of fundamental error warranting reversal of Coffin's conviction.

### III. Evidentiary Rulings

#### A. Gang Activity of Los Carnales Locos

{30} Coffin claims that the trial court erred in admitting testimony about the activities of Coffin's gang, LCL. Specifically, Coffin contends that the testimony was inadmissible evidence of character under Rule 11–404 NMRA 1999 or, alternatively, that it was inadmissible because its prejudicial impact substantially outweighed its probative value under Rule 11–403 NMRA 1999.

{31} Following Detective Robert Martinez's response to the State's question on cross-examination that the Lomas Trece gang was low key, Coffin, anticipating a question about LCL's activities, objected that the State was attempting to elicit testimony that was inadmissible under Rule 11–404. The State responded that Coffin had "opened the door" to gang activity and that no questions would be asked about Coffin's activities within the gang. The trial court, noting that Coffin did not object to the reputational inquiry concerning the Lomas Trece gang, ruled that LCL's activities were relevant to rebut Coffin's argument that the altercation with the Martinezes was gang-related. The State then elicited testimony from Detective Martinez that LCL is a very active gang involved in serious crimes, such as drive-by shootings and other crimes involving weapons.

{32} Rule 11–404 provides:

A. *Character evidence generally.* Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same;

(2) *Character of victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

. . . .

B. *Other crimes, wrongs or acts.* Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Coffin claims that Detective Martinez's reputational testimony that LCL was very active violates the prohibition against character evidence in Rule 11–404(A). *See* Rule 11–405(A) NMRA 1999 (providing that character evidence, when admissible, may be established by testimony as to reputation or opinion). Coffin further claims that Detective Martinez's testimony concerning LCL's involvement in serious crimes, such as drive-by shootings, violates the prohibition against proving character through other crimes, wrongs or acts in Rule 11–404(B). We disagree.

{33} The State did not elicit testimony concerning LCL's activities in order to prove Coffin's character and conformity therewith. Instead, the State sought to rebut Coffin's arguments concerning the reasons for the altercation. Coffin called Detective Martinez as a witness because of his expertise with gangs. He elicited testimony from Detective Martinez that Chris Martinez, Jr. was associated with the Lomas Trece gang. Additionally, Detective Martinez testified on direct examination about the ethnic composition of both Lomas Trece and LCL and the territory that each gang claims. He further testified that Lomas Trece and LCL are rivals. In addition, Coffin attempted to show that the Martinezes made gang signs at John Saldana while he was standing at the drive-up window in front of their car prior to the altercation with Coffin. In his opening statement, Coffin argued that "[e]ven a gang member has the right to defend himself against other gang members, and that's what happened that night. [Coffin] was jumped by two members of a rival gang who he did kill defending himself . . ."

{34} Because Coffin introduced the topic of the reputation and activities of the two gangs in order to portray the incident as self-defense, the State was entitled to impeach this evidence and to elicit relevant context surrounding Detective Martinez's testimony. For example, Detective Martinez testified on cross-examination that he had no information that Chris Martinez, Jr. was an active member of Lomas Trece—only that he "might associate" with active members of the gang. Similarly, to the extent that Coffin attempted to use gang membership to establish the character of Chris Martinez, Jr., Detective Martinez's testimony on cross-examination concerning the relationship between the two gangs was admissible to rebut the implication from direct examination that the gang affiliation of Chris Martinez, Jr. made it more likely that he was a first aggressor in the altercation with Coffin. *See* Rule 11–404(A)(2). Additionally, evidence of the relative activities of Lomas Trece and LCL was admissible in order to rebut Coffin's suggestion that the Martinezes had a motive to attack Coffin due to a gang rivalry. *Cf. State v. Rojo*, 1999–NMSC–001, ¶ 47, 126

N.M. 438, 971 P.2d 829 ("Under Rule 11–404(B), evidence of a defendant's prior acts is admissible to show proof of motive.").

{35} Under Rule 11–403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Coffin argues that even if the evidence of LCL's gang activities was admissible the trial court should have excluded the evidence pursuant to Rule 11–403. We have consistently afforded trial courts wide latitude in deciding whether to exclude, under Rule 11–403, otherwise admissible evidence. *Chamberlain*, 112 N.M. at 726, 819 P.2d at 676 ("The trial court is vested with great discretion in applying Rule [11–403], and it will not be reversed absent an abuse of that discretion."). Coffin injected the issue of his own membership in LCL into the trial from the very beginning. Additionally, his questioning of Detective Martinez, his own witness, centered around the relationship of the Martinezes to the Lomas Trece gang, apparently in an attempt to further his claim that he was attacked by two members of a rival gang due to gang conflict. On appeal, Coffin admits that "gangs were part of the fabric of this case, and neither side attempted to hide the fact." Under these circumstances, we are unable to discern any appreciable unfair prejudice to Coffin from Detective Martinez's testimony on cross-examination. Thus, we conclude that the trial court was well within its discretion in deciding not to exclude the evidence under Rule 11–403.

**B. Statement of Chris Martinez, Jr. Concerning the Temper of Chris Martinez, Sr.**

{36} Coffin sought to introduce an intake and evaluation report by the Youth Diagnostic Development Center (YDDC) from the 1991 commitment of Chris Martinez, Jr. to the New Mexico Boys School. The report contained the statement from Chris Martinez, Jr. "that his father was 'nasty when mad,' particularly while drinking." Coffin offered the statement to prove character of the victim through opinion evidence, *see* Rule 11–404(A)(2), and he argued that the state-

ment was admissible under the business records exception to the hearsay rule, *see* Rule 11–803(F) NMRA 1999.

{37} Coffin correctly asserts that Rule 11–404(A)(2) permits a defendant to adduce opinion or reputation testimony concerning a victim's propensity for violence in order to support a claim that the victim was the first aggressor, and he is correct that the defendant need not be aware of a victim's reputation for violence in order to introduce such evidence. *See State v. Baca*, 115 N.M. 536, 540, 854 P.2d 363, 367 (Ct.App. 1993). However, Coffin overlooks that Rule 11–404(A)(2) is not an exception to the general rule that hearsay evidence is inadmissible. *See* Rule 11–802 NMRA 1999 ("Hearsay is not admissible except as provided by these rules or by other rules adopted by the supreme court or by statute."). Coffin offered the out-of-court statement for the truth of the matter asserted. As such, the statement constitutes hearsay and is inadmissible unless it satisfies an exception articulated in a rule of this Court or by statute. *See* Rule 11–801(C) NMRA 1999 (defining hearsay); Rule 11–802.

{38} Coffin contended in the trial court that the statement was made in the course of regularly conducted business activity and is, therefore, excepted from the hearsay rule. The hearsay rule does not exclude

[a] memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or date compilation ... *unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.*

Rule 11–803(F) (emphasis added). Although Coffin argued to the trial court that the reliability of the statement is not a relevant consideration under this exception, Rule 11–803(F) explicitly contemplates that a trial court will evaluate the trustworthiness of a statement made in a business record. Furthermore, we review a trial court's determination of trustworthiness for an abuse of discretion. *See Kirk Co. v. Ashcraft*, 101 N.M. 462, 468, 684 P.2d 1127, 1133 (1984). The trial court determined that the statement by Chris Martinez, Jr. was inadmissible because "on a variety of levels it is unreliable." Specifically, the trial court stated that "many time[s] statements like these are self-serving," in that the declarant attempts "to glean sympathy from people at YDDC" in order "that instead of wanting to punish him, they're now very sympathetic toward him." We conclude that the trial court did not abuse its discretion in deciding that the statement lacked trustworthiness because of the unreliability of the source of information contained in the business record. The trial court did not err in excluding this evidence.

## C. Statement of Johnny Lucero

{39} Coffin also sought to introduce a statement made to a defense investigator by Johnny Lucero, a witness to part of the incident who died approximately a month before trial. Lucero told the investigator that he was with Leo Gonzales at Sal's, that he saw Ronnie Contreras with Coffin and the Martinezes, and that he heard shots fired after driving away from the parking lot with Leo Gonzales. Coffin offered the out-of-court statement as an exception to the hearsay rule under Rule 11–804(B)(5) NMRA 1999. Coffin claims that the trial court erred in excluding this statement.

{40} If a declarant is unavailable as a witness, the hearsay rule does not exclude

[a] statement not specifically covered by any of the [other] exceptions [in Rule 11–804] but having circumstantial guarantees of trustworthiness, if the court determines that

(a) the statement is offered as evidence of a material fact;

(b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Rule 11–804(B)(5). In determining whether a statement contains circumstantial guarantees of trustworthiness under Rule 11–804(B)(5), trial courts should consider the following four factors:

(1) Ambiguity—the danger that the meaning intended by the declarant will be misinterpreted by the witness and hence the jury; (2) Lack of candor—the danger the declarant will consciously lie; (3) Faulty memory—the danger that the declarant simply forgets key material; and (4) Misperception—the danger that the declarant misjudged, misinterpreted, or misunderstood what he saw.

*State v. Taylor,* 103 N.M. 189, 197, 704 P.2d 443, 451 (Ct.App.1985).

{41} The third and fourth factors articulated in *Taylor* are relevant in this case. The trial court found that the statement was unreliable because Lucero told the investigator numerous times that he had been very drunk at the time of the incident. In addition, Lucero remembered seeing two women in Coffin's van, one light-haired and one dark-haired, even though every other witness involved in this case testified that Deanda Montoya was the only female occupant in the van during that evening. These facts call into question Lucero's memory of the event at the time of making the statement and his perception of the event at the time of the altercation. Additionally, the trial court noted that Lucero stated that he was several blocks away at the time of the shooting, making his statement less probative on many material facts than other evidence available to Coffin. *See* Rule 11–804(B)(5)(b). Reviewing the trial court's ruling on this hearsay issue for an abuse of discretion, *see State v. Ross,* 1996–NMSC–031, 122 N.M. 15, 20, 919 P.2d 1080, 1085, we conclude that the trial court did not err in excluding the statement.

## D. Coffin's Statement to Thomas Peters

{42} Coffin called his friend, Thomas Peters, as a witness to testify that Coffin seemed scared and teary on the night of the shooting and that, the next day, Coffin cried after seeing a news report on the incident. On cross-examination, the State, as a means of impeaching the witness, asked Peters if he and Coffin had discussed the case while Coffin was in jail. After Peters replied, "Sometimes," the State further inquired, "In fact, didn't he [Coffin] fairly recently tell you on the telephone that John [Saldana] was going to fix it?" Coffin objected to the question on hearsay grounds, explaining, on the basis of a pretrial interview, that the State's question involved hearsay within hearsay originating with Saldana's statement to Coffin that he would fix the case. The State replied that "Curtis told this person, 'It will be all right, John's going to fix it, okay,'" and that it was a statement against interest by Coffin. Coffin claims that the trial court erred in allowing the question because it elicited hearsay from Saldana. Coffin does not contest the admission of the statement to the extent that it contained an out-of-court statement made by him. Therefore, we review only the hearsay within hearsay issue.

{43} The State's question does not implicate the hearsay rule because the State did not attempt to introduce Saldana's out-of-court statement for the truth of the matter asserted. *See* Rule 11–801(C) (defining hearsay); *Ross,* 122 N.M. at 20, 919 P.2d at 1085 (concluding that a statement not offered to prove either of its assertions was not hearsay). The State did not seek to introduce Coffin's statement to Peters in order to show that John Saldana would fix the case. The statement was relevant for at least two nonhearsay uses. First, the State charged Coffin with bribery of a witness based on Coffin instructing Saldana not to talk to the police and that Coffin would buy Saldana a plane ticket to get out of town and bail Saldana out if he got arrested. Coffin attempted to portray his offer of a plane ticket to Saldana as "just trying to help out a friend." Thus, the statement made by Coffin that Saldana was going to "fix" the case was relevant in demonstrating, not that Saldana would, in fact, fix the case, but that Coffin believed that Saldana would attempt to do so. We con-

clude that there was no hearsay within hearsay issue. *Cf. Ross*, 122 N.M. at 20 n. 2, 919 P.2d at 1085 n. 2. Second, as the trial court seemed to recognize by allowing the question for the purpose of assessing Coffin's credibility, the jury could reasonably infer from a discussion about fixing the case between Coffin and Saldana that Coffin was attempting to frustrate the prosecution of his case. Thus, the question was proper in attempting to demonstrate a consciousness of guilt. *See Henderson v. State*, 322 Ark. 402, 910 S.W.2d 656, 659 (1995) ("Certainly a factfinder is entitled to know whether a defendant attempted to thwart his prosecution by secreting a witness who had implicated him in the charged offense."); *cf. State v. Trujillo*, 95 N.M. 535, 541, 624 P.2d 44, 50 (1981) (concluding that evidence of flight is admissible and relevant to show consciousness of guilt). Finally, we note that Peters responded to the State's question about Coffin's statement that Coffin had told him that Saldana would "make it better," but that he would "do it in a legal way." Coffin does not allege that this response prejudiced him in any way, and we are unable to discern any possible prejudice. Rule 11–103 NMRA 1999 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . ."). Therefore, we conclude that the trial court did not err in allowing this question.

## IV. Issues Related to the Death Penalty Aspect of the Case

{44} The State filed a notice of intent to seek the death penalty prior to trial. During the death penalty phase of Coffin's trial, the State argued that the killing of Chris Martinez, Jr. involved the aggravating circumstance of killing a witness. The jury deadlocked on whether the aggravating circumstance was present, and Coffin was sentenced to life imprisonment for the murder of Chris Martinez, Jr. Despite the fact that Coffin did not receive the death penalty, Coffin nevertheless argues on appeal several points of error related to the State's seeking of the death penalty.

### A. Prosecutorial Vindictiveness

{45} The State filed its notice of intent to seek the death penalty approximately ten months after Coffin was first arrested and charged. Coffin argues that the State's decision to seek the death penalty was an act of vindictiveness for Coffin's decision not to plead guilty to the charges. Coffin therefore argues that the seeking of the death penalty violated his constitutional right to due process under the Fourteenth Amendment to the United States Constitution. *See State v. Brule*, 1999–NMSC–026, ¶ 7, 127 N.M. 368, 981 P.2d 782 ("[A] vindictive prosecution violates a defendant's right to due process.").

{46} We recently addressed a similar contention. In *Brule*, the defendant argued that the prosecutor vindictively pursued a felony charge, following a nolle prosequi on misdemeanor charges, due to his refusal to plead guilty to the misdemeanor charges. *Id.* ¶ 2. We first determined in *Brule* that the nature of a claim of prosecutorial vindictiveness warrants application of a de novo standard of review. *Id.* ¶ 6. We next declined to adopt a per se rule of presumptive vindictiveness for prosecutorial acts occurring at the pretrial stage of proceedings and, instead, concluded that " 'the defendant must show either: (1) actual vindictiveness or (2) a reasonable likelihood of vindictiveness, which *then* raises a presumption of vindictiveness.' " *Id.* ¶ 10 (quoting *United States v. Contreras*, 108 F.3d 1255, 1262 (10th Cir.1997)) (emphasis added in original).

{47} Applying this test from *Brule*, we conclude that Coffin has failed to demonstrate successfully either actual vindictiveness or a realistic likelihood of vindictiveness sufficient to shift the burden to the State to justify its decision. A defendant's decision to exercise his or her constitutional right to a criminal trial is a routine occurrence in the criminal justice system. *See United States v. Goodwin*, 457 U.S. 368, 381, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) ("[A] defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor. . . . The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system

operates."). Thus, standing alone, a prosecutor's decision to file a notice of intent to seek the death penalty after a defendant's exercise of the constitutional right to a trial but before the trial begins, regardless of the time lapse between arrest and the filing of the notice, fails to indicate any likelihood whatsoever that the State's decision is intended to punish a defendant for not pleading guilty. *See Goodwin*, 457 U.S. at 382–83, 102 S.Ct. 2485 ("[T]he mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified."); *cf. Brule*, 1999–NMSC–026, ¶ 11, 127 N.M. 368, 981 P.2d 782 ("By itself, the District Attorney's decision to pursue felony charges in district court after filing a nolle prosequi on the initial misdemeanor charges does not suggest a likelihood of vindictiveness."). Further, in this case, the grand jury indicted Coffin on two counts of a capital felony for which the potential punishment was death or life imprisonment, and the State charged him with an open count of murder. Additionally, although the State delayed filing a notice of intent to seek the death penalty, the State repeatedly indicated to Coffin that it viewed this case as a potential death penalty case. The possibility of the State seeking the death penalty was a continuing reality in this case. Under these circumstances, we cannot accept Coffin's characterization of the State's filing of a notice of intent to seek the death penalty in this case as a change in prosecutorial action, subsequent to the defendant's exercise of a right, that would subject the prosecutor's conduct to scrutiny for possible retaliation. Therefore, we conclude that Coffin's claim of prosecutorial vindictiveness is without merit.

## B. Probable Cause to Seek the Death Penalty

■ {48} Coffin argues that the trial court erred in denying his motion to dismiss the aggravating circumstance of murder of a witness. In *State v. Ogden*, 118 N.M. 234, 239, 880 P.2d 845, 850 (1994), we explained that a trial court should dismiss an aggravating circumstance that "presents a question of law capable of determination without trial" if "the district court finds that the aggravating circumstance does not apply as a matter of law." By contrast, "[w]hen the applicability of an aggravating circumstance raises a question of fact or a mixed question of fact and law, the district court should grant the defendant's motion to dismiss the aggravating circumstance only when it finds that there is not probable cause to support the aggravating circumstance." *Id.* at 240, 880 P.2d at 851. Because this case involves an aggravating circumstance that raises a question of fact, we review the trial court's decision to deny Coffin's motion "to see whether the district court correctly evaluated probable cause to support the aggravating circumstance." *Id.*

■ {49} The Legislature has provided as an aggravating circumstance for purposes of capital sentencing the "murder of a witness to a crime or any person likely to become a witness to a crime, for the purpose of preventing report of the crime or testimony in any criminal proceeding." NMSA 1978, § 31–20A–5(G) (1981). At the hearing on Coffin's motion to dismiss the aggravating circumstance, the State introduced, as a basis for seeking the death penalty, the grand jury testimony of John Saldana. *See Ogden*, 118 N.M. at 240, 880 P.2d at 851 ("Formal rules of evidence should be relaxed, and hearsay will be admissible."); *see also State v. Smith*, 1997–NMSC–017, ¶ 15, 123 N.M. 52, 933 P.2d 851. Saldana testified before the grand jury that Coffin told him that he killed Chris Martinez, Jr. because he witnessed Coffin killing the man Coffin later learned to be Chris Martinez, Sr. Coffin argued that, even if Saldana accurately stated that Coffin killed Chris Martinez, Jr. because he was a witness, Saldana's statement did not show that Coffin killed him "for the purpose of preventing report of the crime or testimony in any criminal proceeding." Instead, Coffin attempted to explain that, in context, Saldana's statement meant that Coffin killed Chris Martinez, Jr. as a witness because he was concerned about retaliation from the Lomas Trece gang if Chris Martinez, Jr. told gang members that Coffin killed Chris Martinez, Sr. As we explained in *Ogden*, however, in evaluating a motion to dismiss aggravating

circumstances, "[t]he district court must not weigh the evidence or consider evidence of mitigating circumstances." 118 N.M. at 240, 880 P.2d at 850. We therefore agree with the trial court that Saldana's statement constituted probable cause of a statutory aggravating circumstance and that the task of ascertaining the meaning of the statement or the credibility of John Saldana was for the jury at trial. *Cf. State v. Willis*, 1997–NMSC–014, ¶¶ 16, 18, 123 N.M. 55, 933 P.2d 854 (concluding that the prosecution met the probable cause standard for the aggravating circumstance of murder of a witness and stating that "[i]t would be inappropriate at the pretrial stage to require the State to show beyond a reasonable doubt that [the defendant] killed the victim as a witness").

## C. The Trial Court's Excusal of a Juror for Cause

{50} Coffin's final argument related to the death penalty aspect of this case rests on the trial court's excusal for cause of a potential juror, Estella Bachicha. On voir dire, the State, defense counsel, and the trial court questioned Ms. Bachicha about the death penalty. The trial court asked Ms. Bachicha if she could impose the death penalty in some situations, to which Ms. Bachicha answered, "I don't think so." Upon hearing this answer, the trial court followed up with the question, "You don't think you could in any situation?" Ms. Bachicha responded no and that her answer was based on her belief in God. Ms. Bachicha also told the trial court, "I don't know if I can take another person's life." Finally, Ms. Bachicha told the prosecutor that she could not impose the death penalty on Coffin under any circumstances. Based on these responses, the trial court excused Ms. Bachicha for cause.

{51} Coffin claims that the trial court improperly discounted Ms. Bachicha's response to defense counsel that she thought she could listen to both the State and the defense, weigh the aggravating and mitigating circumstances, and vote for either the death penalty or life imprisonment. Coffin also notes that Ms. Bachicha indicated that her views on the death penalty would not affect her ability to determine guilt or innocence. Coffin argues that the improper excusal of Ms. Bachicha violated his due process rights and that the proper remedy for this error is the reversal of his conviction.

{52} With respect to a potential juror's views on capital punishment in a death penalty case, it is well established that "a juror is properly excludable for cause if the juror's views would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.'" *State v. Sutphin*, 107 N.M. 126, 129, 753 P.2d 1314, 1317 (1988) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980))). Because a trial court's decision to excuse a prospective juror for cause based on his or her views on the death penalty will necessarily depend on "a judge's determination of that juror's demeanor and credibility," *id.*, "the trial court is in the best position to 'assess a juror's state of mind.'" *State v. Clark*, 1999–NMSC–035, ¶ 5, 128 N.M. 119, 990 P.2d 793 (quoting *Sutphin*, 107 N.M. at 129, 753 P.2d at 1317). As a result, we review a trial court's excusal for cause of a prospective juror for "a clear abuse of discretion or manifest error." *Sutphin*, 107 N.M. at 130, 753 P.2d at 1318.

{53} The trial court in this case concluded that, despite some minor inconsistency, Ms. Bachicha's overall response clearly indicated that she could not give the death penalty under any circumstances. Based on our review of the record, we conclude that the trial court did not abuse its discretion. In any case, we reject Coffin's argument that the proper remedy for any error in this circumstance would be the reversal of his conviction. The improper excusal of a prospective juror for cause based on the juror's views on capital punishment requires that a death sentence be vacated. *Gray v. Mississippi*, 481 U.S. 648, 659–61, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). However, an excusal of this nature affects only the sentencing phase of a death penalty trial and does not affect the determination of guilt. *See Bumper v. North Carolina*, 391 U.S. 543, 545, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *see also*

*Witherspoon v. Illinois,* 391 U.S. 510, 517–18, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Because Coffin did not receive the death penalty and has presented no evidence that the jury was unable to impartially determine his guilt or innocence, any potential error in excusing Ms. Bachicha for her inability to impose the death penalty could not have caused any prejudice to Coffin.

### V. Right to a Speedy Trial

{54} The police arrested Coffin on March 11, 1995. Coffin's trial began on June 17, 1996. Coffin argues that this fifteen-month, six-day delay violated his right to a speedy trial under the Fourteenth Amendment to the United States Constitution.[2]

 {55} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy a right to a speedy and public trial." This provision is applicable to the states through the Fourteenth Amendment. *Klopfer v. North Carolina,* 386 U.S. 213, 222–23, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). The United States Supreme Court has established a four-part test for evaluating potential violations of the constitutional right to a speedy trial: "Length of delay, the reason for the delay, the defendant's assertion of his [or her] right, and prejudice to the defendant." *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The first part of this test, length of the delay, serves a dual function. *Doggett v. United States,* 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). As an initial matter, the length of the delay must "cross[ ] the threshold dividing ordinary from 'presumptively prejudicial' delay" in order to trigger further inquiry. *Id.* at 651–52, 112 S.Ct. 2686 (quoting *Barker,* 407 U.S. at 530, 92 S.Ct. 2182). If further inquiry is warranted, the length of delay must then be balanced with the other

three factors to determine whether there has been a violation of the Constitution. *Id.* at 652, 112 S.Ct. 2686.

 {56} This case involves a fifteen-month, six-day delay between the time of arrest and the time of trial. *See United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (stating that "the actual restraints imposed by arrest and holding to answer a criminal charge" engages the speedy trial protections of the Sixth Amendment), *quoted in Salandre v. State,* 111 N.M. 422, 425, 806 P.2d 562, 565 (1991). In *Barker,* the Supreme Court noted "the imprecision of the right to speedy trial" and stated that the determination of whether a particular delay can be characterized as presumptively prejudicial "is necessarily dependent upon the peculiar circumstances of the case.... [T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." 407 U.S. at 530–31, 92 S.Ct. 2182 (footnote omitted). We expanded on this analysis in *Salandre,* concluding that a minimum of nine months delay is necessary to trigger further inquiry into the claim of a violation of the right to speedy trial in simple cases, twelve months in cases of intermediate complexity, and fifteen months in complex cases. 111 N.M. at 428 & n. 3, 806 P.2d at 568 & n. 3. "The question of the complexity of a case is best answered by a trial court familiar with the factual circumstances, the contested issues and available evidence, the local judicial machinery, and reasonable expectations for the discharge of law enforcement and prosecutorial responsibilities." *State v. Manzanares,* 1996–NMSC–028, ¶ 9, 121 N.M. 798, 918 P.2d 714.

 {57} Coffin argues that because the evidence in this case was relatively straightforward it should be characterized as a simple case and that, as a result, the delay

---

**2.** Although Coffin also references the New Mexico Constitution, *see* N.M. Const. art. II, § 14 (as amended 1980) (securing the right to "a speedy public trial"), as he did in the trial court, he does not assert that the right to a speedy trial contained in the New Mexico Constitution should be interpreted more broadly than the Fourteenth Amendment. As a result, we base our discussion of this issue on the constitutional requirements established under federal law. *See State v. Gomez,* 1997–NMSC–006, ¶ 23, 122 N.M. 777, 932 P.2d 1 (discussing preservation requirements for asserting a state constitutional provision that has not previously been interpreted more broadly than its federal analog); *cf. City of Albuquerque v. Chavez,* 1998–NMSC–033, ¶ 12, 125 N.M. 809, 965 P.2d 928.

was presumptively prejudicial. The State, on the other hand, references the numerous motions filed by each side and the inherent complexities of any death penalty case to support its contention that this is a complex case for purposes of evaluating presumptive prejudice. Although we have determined that the trial court is in the best position to determine the complexity of a case, the trial court made no findings in this case regarding complexity; instead, it appears that the trial court assumed that the delay was presumptively prejudicial and engaged in the balancing test articulated in *Barker*. We have previously noted that "capital prosecutions . . . [are] uniquely complex and demanding." *Ogden*, 118 N.M. at 239, 880 P.2d at 851. Thus, despite Coffin's assertion to the contrary, there is nothing unusually simple about the proceedings in this death penalty case, and we will consider this to be a complex case for purposes of determining presumptive prejudice. *See Ogden*, 118 N.M. at 239, 880 P.2d at 851 (noting that death penalty cases require more skilled and experienced counsel and extensive investigation into the defendant's background for proof of mitigating circumstances and that "there will be proliferation of pretrial motions, applications, and hearings, consuming significantly more judicial resources than noncapital prosecutions").

{58} We have established fifteen months as a "minimum length of time necessary to trigger the speedy trial analysis in complex cases." *Salandre*, 111 N.M. at 428 & n. 3, 806 P.2d at 568 & n. 3. Given the unusual complexity of death penalty cases and the fact that we spoke of "minimum[s]" in *Salandre*, we do not rule out the possibility that a delay of more than fifteen months in a death penalty case would fail to rise to the level of being presumptively prejudicial. *But see Doggett*, 505 U.S. at 652 n. 1, 112 S.Ct. 2686 (noting that "the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year"). Nevertheless, because the trial court made no specific findings about the complexity of this case, we assume without deciding that the delay of over fifteen months in this case is presumptively prejudicial, and we move on to the *Barker*

balancing test. "[O]nce a defendant has demonstrated presumptively prejudicial delay, the burden of persuasion shifts to the state to show, on balance, that defendant's speedy trial right was not violated." *Salandre*, 111 N.M. at 428, 806 P.2d at 568. "On appeal, 'we now independently balance the factors considered by the trial court in deciding whether a speedy trial violation has taken place.'" *Id.* at 430, 806 P.2d at 570 (quoting *Zurla v. State*, 109 N.M. 640, 642, 789 P.2d 588, 590 (1990)).

{59} While we deem the delay in this case to be presumptively prejudicial, this fact does not necessarily mean that the first factor of the *Barker* test, the length of delay, will weigh against the State. In evaluating the length of delay, we consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. . . . [T]he presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652, 112 S.Ct. 2686. In this case, the extent of delay beyond the minimum fifteen months is exceptionally slight: only six days. Because death penalty cases such as this one are inherently complex, we balance this factor neutrally between the parties. *Cf. United States v. Santiago–Becerril*, 130 F.3d 11, 22 (1st Cir.1997) (concluding that a fifteen month delay in a case of intermediate complexity "[a]rguably . . . was long enough to tip the scales *slightly* in favor of [the defendant's speedy trial] claim" (emphasis added)).

{60} Coffin argues that the second factor, the reason for the delay, weighs heavily against the State. The reason for the delay has been described as "the focal inquiry" in the speedy trial balancing test. *United States v. Sears, Roebuck & Co.*, 877 F.2d 734, 739 (9th Cir.1989). In this case, although the State charged Coffin with, *inter alia*, two open counts of murder on March 23, 1995, the State did not file a notice of intent to seek the death penalty until January 12, 1996. Coffin asserts that the State's late filing of a notice of intent to seek the death penalty caused the delay in this case. After reviewing the entire sequence of events in this case, we disagree.

{61} The grand jury indicted Coffin for, among other crimes, two counts of first degree willful and deliberate murder on March 22, 1995. The grand jury indictment did not include any aggravating circumstances for purposes of the death penalty but did list either the death penalty or life imprisonment as potential penalties for the first degree murder charges. Coffin was arraigned on April 3, 1995, and on April 14, 1995, Kari Converse and Marc Gordon, both of whom are with the death penalty division of the public defender's office, entered an appearance in the case. On October 2, 1995, the State moved for an extension of time for commencement of trial under Rule 5–604(C) NMRA 1999. The motion listed three reasons for the extension: that pretrial discovery was not yet complete, that the trial court had yet to rule on some pretrial motions, and that the prosecutor was scheduled to try two other murder cases in October 1995. The State asserted in its motion that defense counsel did not object to the motion, and the State attached a stipulation to the extension of both counsel. The trial court granted the extension up to and including February 3, 1996, and later set the trial for January 31, 1996.

{62} As late as January 10, 1996, the State and Coffin attempted to reach an agreement in plea negotiations. Defense counsel testified that she asked the prosecutor to wait to file a notice of intent to seek the death penalty until all investigation was exhausted and until it could be determined whether the parties could reach a plea bargain. Defense counsel was aware from the very beginning of the case, based on John Saldana's statements to police and testimony before the grand jury, that this was a possible death penalty case, and the prosecutor indicated to defense counsel that "[t]he only way to dodge going to trial on a death penalty case would be a plea with a very high exposure." On January 11, 1996, the State orally informed Coffin of its decision to seek the death penalty and filed a formal notice the following day.

{63} Coffin asserted his right to a speedy trial at a hearing on January 12, 1996, and argued against any continuance. However, Coffin's assertion of his speedy trial right was contingent on his motion to dismiss the death penalty for lack of probable cause on the aggravating circumstance and for prosecutorial vindictiveness. Defense counsel indicated that if the death penalty was not dismissed "[w]e cannot be ready for trial by January 31st." The trial court indicated that, due to scheduling conflicts, it could not reasonably hear the "panoply of legal motions" that are necessary in a death penalty case prior to the scheduled trial date. As a result, at the trial court's urging, the State petitioned this Court to extend the time of commencement of trial to August 3, 1996, pursuant to Rule 5–604(D). Although Coffin contested this petition for the same reasons asserted in the trial court, he "agree[d] that the case cannot proceed as a death penalty case on January 31." We granted the extension to and including July 5, 1996, and the trial court reset the trial for June 17, 1996. From January until June 14, 1996, both parties investigated further and proceeded with the trial court on the numerous pretrial motions.

{64} On June 3, 1996, following the death of a potential witness, which is discussed further below in relation to prejudice caused by the delay, Coffin moved to dismiss the case due to a violation of his right to speedy trial. The trial court found that the delays between October 3 until January 31 and between January 31 and June 17 were not attributable to either party, but, in terms of the latter delay, the trial court found both the State and Coffin negligent in their preparation for the death penalty aspect of this case. We agree with the trial court's analysis of the delay between October 3, 1995, and January 31, 1996. Further, while we agree with the trial court that the delay in this case after January 1996 is neutral for purposes of the *Barker* balancing test, we do not agree with the trial court that the State was negligent for purposes of a speedy trial analysis in filing the notice of intent to seek the death penalty approximately three weeks before trial.

{65} In New Mexico, "aggravating circumstances are not required to be formally charged in an indictment or ruled

on by the grand jury for the existence of probable cause." *Ogden*, 118 N.M. at 241, 880 P.2d at 852. Instead, the decision to seek the death penalty rests with the charging discretion of the prosecutor for cases involving a capital felony.

> The indictment recites that the crime is a capital felony and also refers to the statute creating the offense. Thus, the indictment is sufficient. Further, when a person is charged with a capital felony, he [or she] is put on notice that the capital felony sentencing procedures will be utilized if a conviction is obtained, including the specific aggravating circumstances allowed.

*State v. Morton*, 107 N.M. 478, 480, 760 P.2d 170, 172 (Ct.App.1988). There is no specific rule establishing a limitation on the amount of time before trial that the State must file a notice of intent to seek the death penalty. However, the State must satisfy the dictates of due process by providing the defendant notice and a meaningful opportunity to be heard regarding the evidence to be admitted at trial concerning specific aggravating circumstances alleged to exist in a particular case. *See Morton*, 107 N.M. at 480–81, 760 P.2d at 172–73. In this case, the State notified Coffin of its intent to seek the death penalty approximately three weeks before trial, and Coffin was aware of the evidence implicating a specific aggravating circumstance, the murder of a witness, from the very early stages of his case. Additionally, Coffin submitted a motion to dismiss the death penalty for lack of probable cause supporting an aggravating circumstance and had an opportunity to be heard on the motion prior to the scheduled trial date. As a result, there is no question that Coffin had adequate notice of the State's seeking of the death penalty in this case. Therefore, we conclude that the State's filing of its notice of intent to seek the death penalty on January 12, 1996, was not negligent with respect to Coffin's right to a speedy trial.[3]

{66} The delay in the commencement of trial due to the notice of intent to seek the death penalty was a result of the preparation needs of both parties and the scheduling difficulties of the trial court. Therefore, we conclude that the delay does not weigh in favor of either party. *Compare Barker*, 407 U.S. at 531, 92 S.Ct. 2182 ("A more neutral reason such as negligence [by the government] or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."), *with id.* at 531, 92 S.Ct. 2182 ("[A] valid reason, such as a missing witness, should serve to justify appropriate delay."), *and In re Darcy S.*, 1997–NMCA–026, ¶ 28, 123 N.M. 206, 936 P.2d 888 (stating that "delays attributable to the defense are not charged against the State").

{67} With respect to the third factor, the defendant's assertion of the right, Coffin notes that he moved to dismiss the case on January 12, 1996, and that he informed the court that any continuance would violate his right to a speedy trial. However, as we indicated above, Coffin asserted to the trial court at the hearing on his motion, and in this Court in response to the State's Rule 5–604(D) petition, that he could not be prepared for trial on January 31, 1996, if the case included the death penalty. Thus, because Coffin's statements at the hearing contradicted his assertion of his right to a speedy trial, we view his objection in January 1996 as only an objection to the inclusion of the death penalty in this case and not a

---

**3.** Of course, as the trial court indicated, the late filing of a notice of intent to seek the death penalty may potentially wreak havoc with a trial court's schedule. Additionally, to the extent that a defendant is prepared for a trial involving the death penalty but the State's late filing of notice causes delays due to a trial court's docket, the delay will be lightly weighed against the State within the speedy trial balancing test. *See Barker*, 407 U.S. at 531, 92 S.Ct. 2182. Thus, while it may be prudent to delay filing notice until plea negotiations are exhausted and the investigation is complete, we discourage prosecutors from delaying the official filing of a notice of intent to seek the death penalty to an extent that it adversely affects a trial court's ability to manage its docket. We also note that trial courts possess the inherent power to manage their dockets and may take appropriate steps to ensure compliance with their efforts. *State v. Ericksen*, 94 N.M. 128, 131, 607 P.2d 666, 669 (Ct.App.1980). Docket control, however, is a separate question from the right to a speedy trial.

demand for trial. *Cf. Barker*, 407 U.S. at 535, 92 S.Ct. 2182 (discussing a defendant's motion to dismiss, noting that "no alternative motion was made for an immediate trial," and stating that "while [the defendant] hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried"). Given the trial court's correct ruling that the notice of intent to seek the death penalty was based on probable cause and not a result of prosecutorial vindictiveness, we conclude that Coffin failed to assert his speedy trial right in a meaningful way. *See United States v. Loud Hawk*, 474 U.S. 302, 314, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) (stating that an assertion of right "must be viewed in the light of ... other conduct"); *cf. Barker*, 407 U.S. at 531, 92 S.Ct. 2182 ("Whether and *how* a defendant asserts his right is closely related to the other factors we have mentioned." (emphasis added)). Further, Coffin did not again assert his right to a speedy trial until two weeks before trial, on June 2, 1996, after learning of the death of his potential witness, Johnny Lucero. We conclude that this factor does not weigh in favor of Coffin. *Cf. Darcy S.*, 1997–NMCA–026, ¶ 32, 123 N.M. 206, 936 P.2d 888 ("Considering the Child's contributing delay in concluding the proceedings both prior to and following her speedy-trial demand, we believe this factor should not be weighed in favor of either party."); *United States v. Munoz–Amado*, 182 F.3d 57, 62 (1st Cir.1999) (discussing a defendant's two motions to dismiss for lack of speedy trial and noting a long delay in between the motions, the filing of the latter motion "at the eleventh hour before trial," and a lack of enthusiasm to go to trial in between the motions).

{68} Finally, we must address the prejudice suffered by Coffin as a result of the delay in commencement of trial. The right to a speedy trial protects the following three interests of a criminal defendant: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532, 92 S.Ct. 2182. Coffin asserts that he suffered prejudice to each of these interests. First, because Coffin has been incarcerated from the time of his arrest, he claims that he suffered from oppressive pretrial incarceration. Additionally, Coffin claims undue anxiety from the delay in the commencement of trial due to the possibility of receiving the death penalty. Finally, Coffin claims prejudice from the death of a witness who, Coffin argues, would have assisted his defense.

{69} We agree with Coffin that his pretrial incarceration and anxiety caused him prejudice. However, we note that all capital defendants face a period of pretrial incarceration and the anxiety that their case potentially involves the death penalty if there is probable cause for the existence of an aggravating circumstance. *See* N.M. Const. art. II, § 13 (as amended 1988) (providing for bail "except for capital offenses when the proof is evident or the presumption great"); *Tijerina v. Baker*, 78 N.M. 770, 773, 438 P.2d 514, 517 (1968) ("[T]he charge of a capital offense raises a rebuttable presumption that the proof is evident and the presumption great that the defendant so charged committed the capital offense, and one so accused is not entitled to bail until that presumption is overcome."). Further, because the constitutional inquiry focuses on undue prejudice, it is significant that this case involves only a minor delay beyond the minimum amount of time that would be considered presumptively prejudicial. *See Salandre*, 111 N.M. at 431, 806 P.2d at 571 ("The operative question is whether the anxiety and concern, once proved, has continued for an unacceptably long period."); *United States v. Henson*, 945 F.2d 430, 438 (1st Cir.1991) ("[C]onsiderable anxiety normally attends the initiation and pendency of criminal charges; hence only 'undue pressures' are considered."); *United States v. Gomez–Villamizar*, 762 F.Supp. 1550, 1552 (D.Puerto Rico 1991) ("While pretrial incarceration ordinarily causes hardship and anxiety, defendant has not alleged any undue prejudice beyond what could normally be expected...."). Therefore, we conclude that Coffin's pretrial incarceration and anxiety weigh lightly in his favor.

{70} Of far greater concern is Coffin's claim that the delay prejudiced his defense. *See Barker*, 407 U.S. at 532, 92 S.Ct.

2182 (describing this aspect of the prejudice factor to be "the most serious … because the inability of a defendant adequately to prepare his case skews the fairness of the entire system"). Because his name was mentioned in police reports, both parties were aware early in the case that Johnny Lucero was present at Sal's near the time of Coffin's altercation with the Martinezes; however, neither party deemed Lucero a sufficiently important eyewitness to interview until the defense discussed Lucero's presence with Ronnie Contreras in January 1996. On January 15, 1996, defense counsel hired an investigator to locate Lucero and eventually obtained a subpoena for him on May 1, 1996. A defense investigator interviewed Lucero for the first time in early May 1996, and defense counsel placed him on a witness list that was filed on May 29, 1996. After filing the witness list, defense counsel learned that Johnny Lucero died in a motorcycle accident on May 23, 1996. Coffin immediately filed a motion to dismiss the case on the ground of a violation of his right to a speedy trial. Coffin claims that if the trial had proceeded as scheduled on January 31, 1996, Lucero would have been available as a witness and that he was a neutral witness that would have provided valuable testimony.

{71} Although defense counsel asserted that she would have been able to locate Lucero sooner, before the original trial date of January 31, the trial court was unable to find that Lucero would have been available in January or that he was a neutral witness. We defer to the trial court's factual findings, and we determine that, based on Coffin's advance notice that Lucero was a potential witness, Coffin's failure to assert his speedy trial right between January 31, 1996, and June 3, 1996, and the fact that Lucero died before the expiration of the minimum amount of time necessary to constitute presumptive prejudice, the State has met its burden of demonstrating that Coffin's defense was unimpaired. *Cf. Salandre*, 111 N.M. at 431, 806 P.2d at 571 (discussing "a nexus between the undue delay in the case and the prejudice claimed" and the fact that evidence was destroyed after the delay became inordinate); *Zurla*, 109 N.M. at 647, 789 P.2d at 595 ("[T]he extent to which the defendant can be said to have prevailed on this issue lessens substantially in the absence of corroborating evidence."). Thus, while the Supreme Court has stated that the death or disappearance of a witness causes obvious prejudice, *Barker*, 407 U.S. at 532, 92 S.Ct. 2182, we conclude from the speculative nature of Lucero's availability at the time of the original trial date that Coffin's defense was not unfairly prejudiced by the delay.[4] *Cf. Loud Hawk*, 474 U.S. at 315, 106 S.Ct. 648 (stating that the "possibility of prejudice [from absence or loss of memory of witnesses] is not sufficient to support respondents' position that their speedy trial rights were violated"); *United States v. Beamon*, 992 F.2d 1009, 1014 (9th Cir.1993) (stating that speculative claims raise "only the possibility of prejudice, and that is insufficient in the Sixth Amendment context"). *See generally* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 18.2, at 410 (1984) ("[T]he defendant must show that the witness truly is now unavailable, that he [or she] would have been available for a timely trial, and that his [or her] testimony would have been of help to the defendant.").

{72} We conclude that the delay in this case was nominal, that Coffin is partly responsible for the delay, that Coffin did not meaningfully assert his right, and that he suffered only minor undue prejudice. Thus, in balancing the four factors articulated in *Barker*, we conclude that the delay of fifteen months and six days between arrest and the commencement of trial did not violate Coffin's right to a speedy trial.

### VI. Sufficiency of the Evidence

{73} Coffin argues for the reversal of his convictions of first degree murder and bribery of a witness because they

---

4. We note that the delay in this case is not sufficiently excessive to warrant relief based solely on presumptive prejudice. *See Doggett*, 505 U.S. at 655–56, 112 S.Ct. 2686 (stating that presumptive prejudice cannot by itself carry a Sixth Amendment claim and that "it is a part of the mix of relevant facts, and its importance increases with the length of delay"); *see also United States v. Beamon*, 992 F.2d 1009, 1014 (9th Cir. 1993).

are unsupported by sufficient evidence. In evaluating a claim of insufficient evidence to support a conviction, we undertake a two-step inquiry. First, "we view the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences to uphold a verdict of conviction." *State v. Sanders,* 117 N.M. 452, 456, 872 P.2d 870, 874 (1994); *accord Sutphin,* 107 N.M. at 131, 753 P.2d at 1319. Second, we "determine[ ] whether the evidence, viewed in this manner, could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Sanders,* 117 N.M. at 456, 872 P.2d at 874; *accord Garcia,* 114 N.M. at 273–74, 837 P.2d at 866–67. "This [C]ourt does not weigh the evidence and may not substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319.

### A. First Degree Murder

{74} Coffin contends that the State failed to introduce sufficient evidence to support the element of a deliberate intent to kill Chris Martinez, Jr. Specifically, Coffin argues that there was not enough time for him to "weigh and consider the question of killing and his reasons for and against such a choice." UJI 14–201. We disagree.

{75} In *State v. Garcia,* 95 N.M. 260, 261, 620 P.2d 1285, 1286 (1980), we addressed the similar contention that "only a few seconds elaps[ing] between the time [the defendant] pulled the gun and shot the deceased" is insufficient to establish "the opportunity to weigh or consider the reasons for or against [the defendant's] course of conduct." We reiterated the principle that " 'an intention or decision arrived at after careful thought and after a weighing of the reasons for the commission of the killing ... may be reached in a short period of time,' " and we concluded that the issue of whether the defendant formed a deliberate intent to kill in only a few seconds was for the jury. *Garcia,* 95 N.M. at 262, 620 P.2d at 1287 (quoting *State v. Lucero,* 88 N.M. 441, 443, 541 P.2d 430, 432 (1975)); *accord* UJI 14–201 ("A calculated judgment and decision may be arrived at in a short period of time.").

{76} In this case, the State presented sufficient evidence from which the jury could infer that Coffin had a deliberate intent to kill Chris Martinez Jr. Deanda Montoya testified that Coffin told Chris Martinez Jr. to get back in his car after shooting his father and, as he started towards his car, Coffin shot him from behind. Chris Martinez Jr. was shot four times, all of which had a trajectory going from the back to the front; he received two gunshots to the back of the head behind the ear and one in the middle of the back. Additionally, two witnesses testified that Coffin pointed his gun toward the ground and fired at one of the victims. Finally, although somewhat equivocal on cross-examination, John Saldana testified that Coffin told him that he killed Chris Martinez Jr. because he witnessed Coffin shooting the first victim, Chris Martinez, Sr. Viewing this evidence in a light most favorable to the State, we conclude that a reasonable jury could infer from the evidence that Coffin formed his intent to kill Chris Martinez Jr. after careful thought and after weighing the considerations for and against the killing. *See Lucero,* 88 N.M. at 443, 541 P.2d at 432 (rejecting an argument similar to Coffin's). Therefore, we reject Coffin's claim of insufficient evidence for his first degree murder conviction.

### B. Bribery of a Witness

{77} Coffin argues that the State failed to introduce sufficient evidence to support his conviction of bribery of a witness contrary to Section 30–24–3(A)(1). At trial, John Saldana testified on behalf of the State that Coffin told him to keep his mouth shut, that if he got arrested Coffin promised to bail him out, and that Coffin offered to buy Saldana an airline ticket to get out of town. Coffin, however, relies on Saldana's testimony on cross-examination that "it could be" that Coffin was trying to help protect Saldana, due to their friendship, from possible retaliation by the Lomas Trece gang. Coffin claims that Saldana's testimony on cross-examination supports an inference that Coffin's promise to buy Saldana an airline ticket was not for the purpose of having Saldana testify falsely or to have him abstain from testifying. *See* § 30–24–3(A)(1). Coffin mis-

apprehends the proper appellate inquiry for a claim of sufficiency of the evidence. As stated above, we do not weigh the evidence or attempt to draw alternative inferences from the evidence. While Saldana's conjecture about Coffin's possible motive might support an inference favorable to Coffin, the jury was free to reject Coffin's explanation of his actions and to draw its own inferences based on the evidence. On appeal, we indulge all permissible inferences in favor of upholding the conviction. Viewing the evidence in a light most favorable to the State, we conclude that there is sufficient evidence in the record for a rational jury to find each element of the crime of bribery of a witness beyond a reasonable doubt.

## VII. Conclusion

{78} We conclude that the trial court properly denied Coffin's requested jury instructions related to his claims of self-defense and provocation and did not err in responding to the jury's question concerning premeditation. We also conclude that the trial court did not err in its evidentiary rulings. There was probable cause for the State to seek the death penalty, and Coffin failed to establish that the State's decision to seek the death penalty was a result of prosecutorial vindictiveness. Additionally, the trial court did not abuse its discretion in excusing a juror for cause due to her responses concerning the death penalty. The delay in the commencement of trial in this case did not violate Coffin's right to a speedy trial. Finally, we conclude that there is sufficient evidence in the record to support Coffin's convictions of first degree murder and bribery of a witness. Given our conclusion that the trial court committed none of the errors claimed, we reject Coffin's argument that cumulative error requires reversal. *See State v. Telles*, 1999–NMCA–013, ¶ 26, 126 N.M. 593, 973 P.2d 845. We affirm Coffin's convictions.

{79} **IT IS SO ORDERED.**

MINZNER, C.J., BACA, FRANCHINI, and MAES, JJ., concur.

