**Certiorari Granted, March 1, 2010, No. 32,149**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-025**

**Filing Date: December 9, 2009**

**Docket No. 28,437**

**STATE OF NEW MEXICO,**

　　**Plaintiff-Appellee,**

**v.**

**TIMOTHY SANDOVAL,**

　　**Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**John W. Pope, District Judge**

Gary K. King, Attorney General
Andrew S. Montgomery, Assistant Attorney General
Santa Fe, NM

for Appellee

David Henderson
Santa Fe, NM

for Appellant

**OPINION**

**GARCIA, Judge.**

**{1}** Timothy "T J" Sandoval (Defendant) appeals his conviction for second-degree murder. Defendant argues several issues on appeal, including fundamental error in the jury instructions. We agree that an error in the jury instructions prevented Defendant from presenting his theory of self-defense and defense-of-another based upon a confrontation involving multiple assailants. We therefore reverse on this issue and remand for a new trial.

1

**BACKGROUND**

**{2}** Sometime around 4:30 p.m. on February 11, 2006, a Ford Explorer chased an Acura sedan down a rural road in Los Lunas, New Mexico, and forced it off the road. The Explorer screeched to a halt on the pavement in front of the Acura, in which Defendant was the passenger. The passenger and driver from the Explorer jumped out and got into an angry altercation with Defendant, which included pulling out firearms. A rapid series of shots rang out from Defendant's gun. Afterward, Defendant jumped back into the Acura that backed up and drove away. The first law enforcement officer to arrive at the scene found the body of Ross Ramos lying on the ground near the Explorer and the body of Jeff McCormick in the backseat of the Explorer. The third occupant from the Explorer, James Arbizu, was on his hands and knees in front of the Explorer covered in blood. Ramos and Arbizu were brothers, and McCormick was the father of Ramos' and Arbizu's little brother. When the officer asked Arbizu who did this to him, he responded, "TJ did it." Defendant, who was nineteen years old at the time, turned himself in the next day. The State charged him with two open counts of murder for the killing of Ramos and McCormick.

**{3}** During opening statements, defense counsel told the jury that Defendant admitted to shooting all three men in self-defense and in defense of his girlfriend, Vanessa Crouch, who was driving the Acura. The prosecutor told the jury that Defendant was not being prosecuted for shooting Arbizu because Arbizu had a gun when Defendant shot him. The State conceded that Defendant acted in self-defense against Arbizu but argued that he did not need to shoot Ramos and McCormick in self-defense because they were unarmed.

**{4}** Defendant did not testify, but Crouch told the jury that on the day of the shooting she and Defendant had spent the day working at McDonald's, where Defendant was an assistant manager. After work they delivered birthday gifts to Crouch's mother and were returning home in her Acura when they stopped for gasoline at J & J Country Mart. Defendant went inside to pay while Crouch pumped the gas. Meanwhile, Ramos drove up in the Ford Explorer. Arbizu was in the front passenger seat and McCormick was in the back seat.

**{5}** Crouch testified that when Defendant walked out of the store, he was called over to the Explorer. She heard the occupants of the Explorer shout "East Side," the name of a local gang. A passenger got out of the Explorer and confronted Defendant, yelling, shouting profanities, and threatening Defendant with what Crouch thought was a knife. Defendant walked away with his hands up, saying he did not want any problems and that he did not know them. He got into the passenger's seat of the Acura, and Crouch drove off, headed for home.

**{6}** According to Arbizu's testimony at trial, he spent most of the day with Ramos working on a car. He said that they had been drinking but that Ramos only drank one or two beers. Later in the day, McCormick called to ask for a ride home from work. After they picked him up, they stopped at the J & J Country Mart for some cigarettes and ran into Defendant.

**{7}** According to Crouch, as she tried to speed away from the store, the Explorer chased

them through the rural residential area. The Explorer pulled up next to her and forced her off the road. Crouch had to slam on the brakes to pull over and the Explorer screeched to a stop in front of her car. The passenger jumped out of the Explorer before it came to a complete stop. He had a gun in his hand, and she saw him cock his weapon. As soon as the Explorer came to a complete stop, the driver also jumped out and ran to the front of the Acura while grabbing at his side. Defendant got out of the car at some point with a gun. The driver and passenger yelled and cursed at Defendant and shouted "East Side." Arbizu was pointing his gun at Defendant. Defendant put his hands down and said again that he did not know them and did not want any problems. "I was scared for my life," Crouch said. "I was thinking about my family. I didn't think I was going to be able to go home. I was just thinking I was going to have to sit there and watch them shoot my boyfriend, because there was nothing that I could do."

**{8}** Crouch said that the men from the Explorer told Defendant to put his gun down, but as soon as he lowered it, she saw the driver reach to his side and she thought he was going to shoot Defendant. That was when the shooting started. It was over in a few seconds. Defendant ran back to the car, she backed away from the Explorer, and they drove home. Crouch believes that Defendant saved both their lives.

**{9}** Arbizu testified that his memory of the day was not that clear because of his injuries. He admitted that he had a gun. Arbizu was shot four times, and said that he passed out and woke back up. After Arbizu heard the Acura drive off, he got his cell phone and tried to call his mother and then his father before he successfully contacted his girlfriend. Arbizu's girlfriend testified that while talking to Arbizu she heard a man in the background say "[l]et's bail" and a car peel out.

**{10}** Perry Sanchez testified that he was in his barn saddling some horses when the Acura came to a screeching halt in his driveway and the Explorer pulled in front of it on the pavement. Sanchez saw the driver from the Explorer get out at about the same time as the passenger from the Acura. The driver came around the Explorer and stood in front of the Acura. He heard arguing and looked away. His daughter said, "Dad, he's got a gun." When he turned back, he saw the passenger from the Acura had a gun and was pointing it at a man from the Explorer. The man from the Explorer had his hands up and said, "Put your gun down, homes, put your gun down, homes." The passenger from the Acura "started to drop his gun. And I seen the other guys; they were taking their hands down." The driver started reaching, but "I didn't see him pull anything." Sanchez then turned around. "[T]hat's when all the shooting started." Sanchez grabbed his daughter and threw her into the horse trailer. When he looked up again, he saw the passenger shoot inside the back window of the Explorer and then run back and jump in the Acura. The Acura backed up and took off. Sanchez testified that the shots occurred in rapid succession lasting fifteen to twenty seconds. When he approached the Explorer after the Acura left, Arbizu was holding his bleeding chin and walking around confused.

**{11}** Another witness, Richard Bear, testified that he heard a rapid series of shots one right after another, looked up, and saw the dust come up when one shot hit the dirt. Bear saw the silhouette of an individual pointing a gun and shooting. Then he heard a car door close and

saw the car take off.

**{12}** A clinical psychologist testified for the defense that Defendant suffered from post-traumatic stress disorder based on the shooting and that in her opinion Defendant had been in great fear during the incident that he or Crouch were going to be killed immediately. The State's rebuttal witness, a forensic psychologist, testified that Defendant's conduct was consistent with overwhelming fear and that based on the police reports he had to defend himself but that there may have been an opportunity for flight before shooting McCormick.

**{13}** Defendant fired at least eight shots. One of his shots hit Arbizu's gun, disabling it. The State could tell from the way Arbizu's gun was hit that it was cocked, loaded, and pointed at Defendant. Ramos was shot twice and died from a gunshot wound to the head. McCormick was found lying in the back seat with his feet hanging out the open door and a pack of cigarettes in his hand. He died of a close-range gunshot wound to the head. Another bullet passed through the back window of the Explorer.

**{14}** The State relied on extensive police reconstruction in an attempt to establish that Arbizu was shot first, then Ramos, and finally McCormick. Other than Arbizu's disabled gun, no other firearms were found at the scene. Beer cans and an empty beer case were found in the Explorer. Ramos had a blood alcohol content of .12 at the time of the incident.

**{15}** In closing, the State conceded that Defendant acted in self-defense but argued that he went too far. Defense counsel argued that the three occupants of the Explorer were aggressors acting in concert and were shot in self-defense and in defense of Defendant's girlfriend. The jury acquitted Defendant of the charge for shooting Ramos and convicted him of second-degree murder for shooting McCormick.

**DISCUSSION**

**{16}** The district court gave self-defense and defense-of-another instructions on each of the two counts of homicide. The self-defense instructions for both homicides were the same, except for the name of the person shot. Thus, the self-defense instructions stated the following:

> Evidence has been presented that the defendant killed Ross Ramos [or Jeff McCormick] in self-defense.
>
> 1.     The killing is in self defense if:
>
> 2.     There was an appearance of immediate danger of death or great bodily harm to the defendant *as a result of his confrontation with Ross Ramos and James Arbizu*; and
>
> 3.     The defendant was in fact put in fear by the apparent danger of immediate death or great bodily harm and killed Ross Ramos [or Jeff McCormick] because of that fear; and

4.     A reasonable person in the same circumstances as the defendant would have acted as the defendant did.

The burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self defense. If you have a reasonable doubt as to whether the defendant acted in self defense you must find the defendant not guilty.

(Emphasis added.) *See* UJI 14-5171 NMRA. Similarly, both instructions on defense-of-another told the jury to consider the appearance of immediate danger of death or great bodily harm to Crouch "as a result of the confrontation between [Defendant] and Ross Ramos and James Arbizu." *See* UJI 14-5172 NMRA.

**{17}** Defendant argues that the jury instructions were erroneous because they directed the jury to only consider the threat stemming from Ramos and Arbizu. Defendant contends that the jury was not adequately instructed on his theory that he had a right to defend himself and Crouch against multiple assailants, including McCormick, because the jury instructions did not tell the jury to deliberate on whether McCormick appeared to be part of the threat.

**{18}** "The standard of review we apply to jury instructions depends on whether the issue has been preserved." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. Defendant concedes that we should review this issue for fundamental error because there is no record of a jury instruction conference or an indication that Defendant objected to the instructions that were given. *See* Rule 12-216(B)(2) NMRA (stating that issues not preserved below may be reviewed for fundamental error); *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728 ("When the trial court had no opportunity to rule on a [claimed error] because the defendant did not object in a timely manner, we review the claim on appeal for fundamental error."). In order for this Court to reverse pursuant to a fundamental error review, the error "must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *State v. Garcia*, 46 N.M. 302, 309, 128 P.2d 459, 462 (1942). Based on an examination of the whole record, we must determine whether the jury instructions were erroneous and, if so, whether the error rose to the level of fundamental error.

**The Propriety of Self-Defense and Defense-of-Another Instructions Against Multiple Assailants**

**{19}** "For a defendant to be entitled to a self-defense instruction, . . . there need be only enough evidence to raise a reasonable doubt in the mind of a juror about whether the defendant lawfully acted in self-defense." *State v. Rudolfo*, 2008-NMSC-036, ¶ 27, 144 N.M. 305, 187 P.3d 170. "[A] self-defense instruction is required whenever [or if] a defendant presents evidence sufficient to allow reasonable minds to differ as to all elements

5

of the defense." *State v. Ellis*, 2008-NMSC-032, ¶ 15, 144 N.M. 253, 186 P.3d 245 (second alteration in original) (internal quotation marks and citation omitted). Those elements require that:

> (1) the defendant was put in fear by an apparent danger of immediate death or great bodily harm, (2) the killing resulted from that fear, and (3) the defendant acted reasonably when he or she killed. The first two requirements, the appearance of immediate danger and actual fear, are subjective in that they focus on the perception of the defendant at the time of the incident. By contrast, the third requirement is objective in that it focuses on the hypothetical behavior of a reasonable person acting under the same circumstances as the defendant.

*Rudolfo*, 2008-NMSC-036, ¶ 17 (internal quotation marks and citations omitted). In other words, "[t]o justify the use of deadly force in self-defense, there must be some evidence that 'an objectively reasonable person, put into Defendant's subjective situation, would have thought that [he or she] was threatened with death or great bodily harm, and that the use of deadly force was necessary to prevent the threatened injury.'" *State v. Cooper*, 1999-NMCA-159, ¶ 8, 128 N.M. 428, 993 P.2d 745 (citation omitted).

**{20}** "In the usual case, self-defense is justified when force is directed toward a person posing a threat of imminent bodily harm." *Id.* However, significant to the present case, we recognized in *Cooper* that defendants are entitled to self-defense instructions when there is evidence that they were threatened by multiple assailants acting together. *Id.* ¶ 11. Thus, we adopted the following rule:

> When two or more persons undertake overt action to harm another, the victim may use an appropriate amount of force to defend himself against either aggressor, or both of them. If supported by the evidence, the defendant is entitled to a self-defense instruction in which the jury considers threatened harm from all assailants, not just the one against whom the defendant may have retaliated.

*Id.*

**{21}** We concluded in *Cooper* that a self-defense instruction against multiple aggressors is warranted even when the person the defendant assaulted never posed a direct threat, as long as there is evidence that the person defendant assaulted was acting in complicity with the other assailants. *Id.* ¶¶ 13-14. For example, in *Cooper*, the threat of imminent bodily harm did not come from the individual upon which the defendant claimed he was using force in self-defense. *Id.* ¶ 8. Rather, the direct threat came from another person who had a gun. *Id.* We nonetheless held that when a defendant claims that he or she reasonably believed that multiple individuals were acting together and threatening the defendant with serious harm, the defendant is entitled to a self-defense instruction against any or all assailants. *Id.* ¶ 14.

6

The jury instruction must be broad enough to allow the jury to consider the threat posed by all assailants acting together or in complicity with one another. *Id.* ¶¶ 11-12. We emphasized, however, that a defendant is not entitled to a self-defense instruction against multiple assailants when the defendant's actions are taken against an innocent third party or bystander. *Id.* ¶ 9.

**{22}** In the present case, Defendant applied deadly force not only to the person who had a gun and posed the most direct threat of harm, Arbizu, but also to Arbizu's companions, Ramos and McCormick. The district court gave self-defense and defense-of-another instructions on both homicides. However, the self-defense instructions described the first element, the threat perceived by Defendant, solely in terms of Defendant's "confrontation with Ross Ramos and James Arbizu." The issue before us is whether the instructions on McCormick's homicide were erroneous because they did not include the participation and complicity of McCormick as part of the confrontation and immediate threat to Defendant and Crouch. By excluding any mention of McCormick's actions and his complicity in the confrontation and threat to Defendant, Defendant claims that the instructions were erroneous. As such, the jury was not instructed to consider whether Defendant reasonably believed that Ramos, Arbizu, *and* McCormick were acting together during the confrontation and in complicity when threatening Defendant and Crouch. The jury, therefore, would not have understood that it had to consider whether McCormick's actions were part of the threat perceived by Defendant.

**{23}** In measuring a defendant's entitlement to a self-defense instruction, we examine the evidence from the standpoint of the defendant. *Id.* ¶ 2. Under the circumstances of this case and viewing the evidence from Defendant's point-of-view, we agree that Defendant was entitled to self-defense instructions that were broad enough to allow the jury to consider whether self-defense was justified against McCormick under a multiple-assailant theory. *See id.* ¶¶ 11-12; *see also* UJI 14-5171 Use Note 3 (providing that the act resulting in the appearance of immediate danger of death or great bodily harm be described in "enough detail to put the act in the context of the evidence"); UJI 14-5172 Use Note 3 (same). Although Defendant did not testify, Crouch provided ample testimony regarding the series of confrontations and the complicity of all three assailants during the threats against Defendant and Crouch. Based on Crouch's testimony, the jury could reasonably infer that Defendant, who was in front of the Acura and even closer to the action, saw at least what Crouch did and, like Crouch, was afraid for his life and Crouch's life based on an apparent threat from all three occupants of the Explorer. *See State v. Duarte*, 1996-NMCA-038, ¶ 7, 121 N.M. 553, 915 P.2d 309 (recognizing that while it is more difficult to show actual fear without a defendant's testimony, a jury can infer intent from the circumstantial evidence). McCormick's complicity in the events at the convenience store and at the site of the shooting could be viewed by the jury as sufficient to establish that he was not an innocent bystander to the assaults. The jury could determine that he was part of the confrontation and acting in complicity with Ramos and Arbizu when he opened the passenger side door and partially exited the Explorer while apparently reaching for something inside the vehicle. A reasonable jury could interpret such evidence as though McCormick was looking for a

7

weapon and participating in the fray. Thus, the evidence was sufficient to create a jury question about whether McCormick was one of the assailants under a multiple-assailant theory of self-defense and defense-of-another. *See Cooper*, 1999-NMCA-159, ¶¶ 16-17.

**{24}** Furthermore, the witnesses all described the shots happening very quickly. A clinical psychologist testified that in her opinion Defendant had been in great fear during the incident and believed that he and Crouch were going to be killed immediately. The State's rebuttal witness, a forensic psychologist, also testified that Defendant's conduct was consistent with overwhelming fear. There was sufficient evidence to support Defendant's theory that everything happened very quickly and that he was in the middle of a chaotic, life-threatening situation in which he and Crouch were in imminent danger from all three assailants. A reasonable jury might find that a person in Defendant's position would believe that McCormick acted together and in complicity with Ramos and Arbizu to assault and threaten to harm Defendant and Crouch.

**{25}** We recognize that the State presented evidence that attempted to establish that McCormick was an innocent bystander who was just getting a ride home, was holding a pack of cigarettes in his hand, and was trapped in the Explorer due to a child safety lock on the rear passenger door. The State also attempted to establish that Defendant first shot Arbizu, the only one who was armed, then shot Ramos and, when both of these individuals were lying on the ground, walked up to the Explorer and shot McCormick, even though all actual threats had been eliminated. However, viewing the evidence in the light most favorable to the State is not the standard to be applied when determining whether defense instructions should have been given. We remind the State that it must present the evidence and its arguments according to the appropriate standard of review.

**{26}** We conclude as a matter of law that Defendant has presented sufficient evidence to argue that he reasonably feared all three assailants, and Defendant thought he was in a fight for his life and the life of Crouch. The ultimate question of whether Defendant was justified in his fear of all three assailants, including McCormick, whether he killed McCormick because of that fear, and whether the force he used was reasonably necessary to abate the imminent threat of immediate death or great bodily harm were classic issues for the jury to decide. *See id.* ¶ 16. In this case, the jury instructions were not broad enough to properly instruct the jury to consider the threat from McCormick acting together and in complicity with Ramos and Arbizu. *See id.* ¶¶ 11-12. By directing the jury to not consider McCormick in any way, the jury instructions, in effect, resolved a material issue of fact that was for the jury to decide, which was whether McCormick acted together and in complicity with Ramos and Arbizu. Such an instruction prevented Defendant from properly asserting his defenses in the context of the evidence. We therefore conclude that the district court erred in instructing the jury too narrowly on Defendant's theories of self-defense and defense-of-another. If Defendant had objected at trial, we would have concluded that reversible error occurred.

**Fundamental Error**

8

**{27}** We now address whether the erroneous jury instructions rose to the level of fundamental error. Under a fundamental error analysis, we "'review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the [d]efendant's conviction was the result of a plain miscarriage of justice.'" *State v. Barber*, 2004-NMSC-019, ¶ 19, 135 N.M. 621, 92 P.3d 633 (quoting *Benally*, 2001-NMSC-033, ¶ 24 (Baca, J., dissenting)); *see State v. Orosco*, 113 N.M. 780, 783, 833 P.2d 1146, 1149 (1992) (stating that our task under a fundamental error review is "to determine whether the error so undermined the reliability of the conviction or prejudiced the defendant's rights as to require reversal"); *State v. Gee*, 2004-NMCA-042, ¶ 8, 135 N.M. 408, 89 P.3d 80 ("We will reverse for fundamental error when the foundation or basis of a defendant's case or an essential right in a defense is affected."). We previously have held that fundamental error results "from instructions which, through omission or misstatement, fail[ed] to provide the juror[s] with an accurate rendition of the relevant law." *Benally*, 2001-NMSC-033, ¶ 12; *see, e.g.*, *State v. Foxen*, 2001-NMCA-061, ¶¶ 10, 15, 130 N.M. 670, 29 P.3d 1071.

**{28}** Defendant had the fundamental right to present his theory of defense to the jury. *See State v. Lucero*, 1998-NMSC-044, ¶ 5, 126 N.M. 552, 972 P.2d 1143 ("It is basic that a defendant is entitled to have his [or her] theory of the case submitted to the jury under proper instructions where the evidence supports it." (alteration in original) (internal quotation marks and citation omitted)). An accurate rendition of Defendant's theory of defense would have included McCormick as an aggressor in the self-defense and defense-of-another instructions. *See Cooper*, 1999-NMCA-159, ¶¶ 12-14. Having found enough evidence to provide a self-defense instruction against all three assailants, the district court was obligated to properly instruct the jury on all elements of self-defense. *See* Rule 5-608(A) NMRA (requiring that the "court must instruct the jury upon all questions of law essential for a conviction"); *Foxen*, 2001-NMCA-061, ¶ 12 (discussing the "well-established principle that adequate instruction on self-defense is the duty of the courts where it finds support in the evidence"). The deficiency in the given instructions did not comport with the district court's position that Defendant be able to present his theory that he was defending himself and Crouch against all three assailants. The court's failure to adequately and accurately describe Defendant's theory of defense violated Defendant's fundamental rights. *Cf. State v. Coffin*, 1999-NMSC-038, ¶ 13, 128 N.M. 192, 991 P.2d 477 (holding that jury instructions that included both victims and their alleged threatening actions adequately and accurately reflected the defendant's self-defense theory and were not in error).

**{29}** In addition to failing to present Defendant's defense theory, the instructions impermissibly eased the State's burden of disproving all elements of self-defense and defense-of-another. By not including McCormick's name in the instructions, the State was relieved of proving beyond a reasonable doubt that Defendant did not act to defend himself and Crouch against McCormick. This elimination of a portion of the State's burden of proof is contrary to law as set forth in numerous cases. *See, e.g.*, *Foxen*, 2001-NMCA-061, ¶ 9 ("[T]he authorities agree upon a basic premise . . . that jury instructions must inform, 'in no uncertain terms,' that the [s]tate bears the burden of disproving self-defense." (citation

9

omitted)).

{30}    The State argues that any error in the instructions did not prejudice Defendant because the jury was allowed to find an appearance of immediate danger of death or great bodily harm based entirely on the fact that there was a life-threatening confrontation between Defendant and Ramos and Arbizu. We are not persuaded by the State's argument. The law required the jury to evaluate whether McCormick appeared to be part of the threat. *See Cooper*, 1999-NMCA-159, ¶¶ 12-14. Having reviewed the jury instructions as a whole and in context with the other instructions given, *see State v. Cunningham*, 2000-NMSC-009, ¶¶ 15-19, 128 N.M. 711, 998 P.2d 176 (affirming the defendant's conviction when a second instruction correctly stated the missing element and cured any possible confusion), we determine that the jury would have been confused by the instructions and could not correctly evaluate Defendant's case. *See Benally*, 2001-NMSC-033, ¶¶ 12, 22 (reversing the defendant's convictions because the jury was confused by the jury instructions regarding self-defense).

{31}    There was an issue at trial as to whether McCormick was an aggressor. The State attempted to characterize him as an innocent bystander. *See Coffin*, 1999-NMSC-038, ¶ 12 ("While it is true that a person may act in self-defense against multiple attackers acting in concert, this principle applies only to the extent that each accomplice poses an immediate danger of death or great bodily harm, thereby necessitating an act of self-defense."). During closing statements, the State argued the notion that "whoever showed up with James Arbizu was fair game," or that Defendant "[could] take out whoever happens to be with or near [Arbizu], the aggressor." By not including McCormick as an aggressor, the instruction effectively identified McCormick as an innocent bystander. *See Cooper*, 1999-NMCA-159, ¶ 9 (stating that a defendant cannot claim self-defense against an innocent third party). The wording of the jury instructions could have been interpreted to conclude that Defendant's actions were not justified. *See State v. Reneau*, 111 N.M. 217, 219, 804 P.2d 408, 410 (Ct. App. 1990) ("The inquiry in a self-defense claim focuses on the reasonableness of [the] defendant's belief as to the apparent necessity for the force used to repel an attack."). The omission of any reference to McCormick in the defense instructions reinforced the State's arguments to the jury that it was unreasonable for Defendant to react in self-defense against someone who was not an aggressor and was merely present during the attack. The instruction ultimately eliminated a critical determination from the jury's consideration. *See Cooper*, 1999-NMCA-159, ¶ 16.

{32}    The verdicts in the case increase our concern regarding the inaccurate jury instructions. After receiving instructions including Ramos as an aggressor, the jury found Defendant not guilty of Ramos' murder. However, after receiving the instructions that did not include McCormick as an aggressor, the jury found Defendant guilty of McCormick's murder. It is not possible to determine whether the jury rendered a proper verdict when the defense instructions were inadequate regarding the shooting of McCormick. Accordingly, we have grave concerns about whether the jury understood Defendant's theory of defense and considered the facts in light of his theory. *See State v. Mascareñas*, 2000-NMSC-017,

10

¶ 21, 129 N.M. 230, 4 P.3d 1221 (reversing the defendant's conviction under the fundamental error rule because there was "simply no way to determine that the jury delivered its verdict on a legally adequate basis"); *cf. Cunningham*, 2000-NMSC-009, ¶¶ 15-19 (declining to invoke the fundamental error rule because the Court was confident that the instructions as a whole adequately addressed the elements of unlawfulness).

**{33}** We hold that fundamental error occurred when the district court submitted jury instructions that did not direct the jury to consider Defendant's theory of defense regarding McCormick, relieved the State's burden of disproving self-defense beyond a reasonable doubt, and misstated the law regarding an attack by multiple assailants. After reviewing the entire record and placing the jury instructions in the context of the facts and circumstances of this case, this Court would fail to do substantial justice if it allowed Defendant's conviction to stand on jury instructions that did not inform the jury of his theory of self-defense. *See Orosco*, 113 N.M. at 784, 833 P.2d at 1150 (recognizing that the rule of fundamental error applies when substantial justice has not been done); *State v. Mantelli*, 2002-NMCA-033, ¶ 46, 131 N.M. 692, 42 P.3d 272 (recognizing that "[i]n such close circumstances, where the error involves the central issue in the case, it is the better policy to require a new trial under the correct instruction"). Because the error went to the heart of Defendant's case and improperly limited his right to self-defense and defense-of-another instructions, we hold that the deficiencies in the jury instructions constituted fundamental error. *See Garcia*, 46 N.M. at 309, 128 P.2d at 462. Since we reverse on this issue, we do not need to address Defendant's remaining assertions of error.

**CONCLUSION**

**{34}** We hold that the district court committed fundamental error by giving deficient jury instructions on Defendant's theory of self-defense and defense-of-another involving multiple assailants. Therefore, we reverse and remand for a new trial on the homicide charge involving McCormick.

**{35}   IT IS SO ORDERED.**

_____
**TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Judge**

_____
**ROBERT E. ROBLES, Judge**

**Topic Index for *State v. Sandoval*, No. 28,437**

11

| **AE** | **APPEAL AND ERROR** |
| --- | --- |
| AE-FE | Fundamental Error |
| AE-RM | Remand |

| **CL** | **CRIMINAL LAW** |
| --- | --- |
| CL-DA | Defense of Another |
| CL-MU | Murder |
| CL-SD | Self-defense |

| **CA** | **CRIMINAL PROCEDURE** |
| --- | --- |
| CA-JI | Jury Instructions |
| CA-SD | Self-defense |

| **JI** | **JURY INSTRUCTIONS** |
| --- | --- |
| JI-CJ | Criminal Jury Instructions |
| JI-IJ | Improper Jury Instructions |