This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-39409**

**STATE OF NEW MEXICO,**

> Plaintiff-Appellee,

v.

**ISAIAS LOBATO-RODRIGUEZ,**

> Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF GRANT COUNTY**
**Jarod K. Hofacket, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Lauren Joseph Wolongevicz, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Thomas J. Lewis, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**DUFFY, Judge.**

**{1}** Following a jury trial, Defendant Isaias Lobato-Rodriguez was convicted of second degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994). On remand from the New Mexico Supreme Court, *see State v. Lobato-Rodriguez*, 2024-NMSC-014, ¶ 34, 548 P.3d 21, we address the four remaining issues raised in Defendant's direct appeal: whether (1) the district court erred in denying Defendant's request for a self-defense instruction, (2) the district court should have suppressed statements Defendant

made to border patrol agents, (3) the district court erred in denying Defendant's request to correct an error in the translation of his trial testimony, and (4) cumulative errors require reversal. We affirm.

## DISCUSSION

**{2}** The factual background appears in *Lobato-Rodriguez*, 2024-NMSC-014, ¶¶ 2-11, and will not be restated here. Because this is a memorandum opinion prepared solely for the benefit of the parties, we set forth additional facts only as necessary to resolve the issues presented in this appeal.

### I.    Self-Defense Instruction

**{3}** Defendant asserts that the district court erred in denying his request for a self-defense instruction. The State responds that there is no view of the evidence that would have entitled Defendant to an instruction on self-defense. We agree with the State.

**{4}** "A defendant is only entitled to jury instructions on a self-defense theory if there is evidence presented to support every element of that theory." *State v. Baroz*, 2017-NMSC-030, ¶ 14, 404 P.3d 769. "Those elements are that (1) the defendant was put in fear by an apparent danger of immediate death or great bodily harm, (2) the killing resulted from that fear, and (3) the defendant acted reasonably when [they] killed." *State v. Rudolfo*, 2008-NMSC-036, ¶ 17, 144 N.M. 305, 187 P.3d 170 (internal quotation marks and citation omitted). "The first two requirements, the appearance of immediate danger and actual fear, are subjective in that they focus on the perception of the defendant at the time of the incident." *State v. Coffin*, 1999-NMSC-038, ¶ 15, 128 N.M. 192, 991 P.2d 477. "By contrast, the third requirement is objective in that it focuses on the hypothetical behavior of a reasonable person acting under the same circumstances as the defendant." *Id.*

**{5}** Our review on appeal is de novo. *See Rudolfo*, 2008-NMSC-036, ¶ 13. "We do not weigh the evidence but rather determine whether there is sufficient evidence to raise a reasonable doubt about self-defense." *State v. Gaines*, 2001-NMSC-036, ¶ 4, 131 N.M. 347, 36 P.3d 438. "[W]e view the evidence in the light most favorable to the giving of the requested instruction." *Baroz*, 2017-NMSC-030, ¶ 15 (alteration, internal quotation marks, and citation omitted). "Failure to instruct on self-defense when there is a sufficient quantum of proof to warrant it is reversible error." *Gaines*, 2001-NMSC-036, ¶ 4.

**{6}** Defendant argues that the evidence was sufficient to warrant a self-defense instruction based on the totality of suspicious events that led him to believe Victim wanted to take his life. These included the following: (1) Victim was originally supposed to drive Defendant from Florida to El Paso, Texas but changed the plan during the trip and said she would take him to Agua Prieta in Sonora, Mexico instead; (2) Defendant observed Victim making phone calls to unknown persons in Mexico and talking to suspicious people at the hotel in El Paso; (3) Defendant saw a white pickup truck

following them from El Paso and making threatening gestures. Defendant became increasingly alarmed as the day progressed. Defendant testified that he calmed himself, but at some point later that day, he and Victim got into an argument. From the back seat, he wrapped a belt around Victim's neck and the seat and tied it in a knot. Defendant testified that he kept the belt around Victim's neck for about twenty minutes before he tightened it, cutting off Victim's airway, killing her. During the incident, the van they were traveling in crashed into a barbed-wire fence on the side of the road. Defendant testified that he thought strangling Victim was the only way he could escape.

**{7}** Turning to the elements of self-defense, Defendant argues that evidence supported the first two subjective elements because he was put in fear by the events described above. Defendant's argument concerning events that happened in the days leading up to the killing, however, does not address whether any threat existed at the time he placed the belt around Victim's neck, much less twenty minutes later when he tightened the belt. *See Rudolfo*, 2008-NMSC-036, ¶ 18 ("It is important to view the circumstances at the time the deadly force was used by the defendant and not at some earlier point."). Defendant did not testify that Victim posed any direct and immediate threat to him when he pulled the belt tight around her neck; she was unarmed and defenseless, having already been immobilized for twenty minutes. *See State v. Cooper*, 1999-NMCA-159, ¶ 8, 128 N.M. 428, 993 P.2d 745 ("To justify the use of deadly force in self-defense, there must be some evidence that an objectively reasonable person, put into Defendant's subjective situation, would have thought that [they were] threatened with death or great bodily harm, and that the use of deadly force was necessary to prevent the threatened injury." (internal quotation marks and citation omitted)). Likewise, although Defendant testified that he feared the men in the white pickup truck, he did not testify that they were in the vicinity or posed any threat at the time he tightened the belt around Victim's neck. There was no one else at the scene when border patrol agents arrived. Thus, even if Defendant was put in fear by the events he described, there is no evidence indicating that he faced an appearance of immediate death or great bodily harm at the time he strangled Victim. *See Rudolfo*, 2008-NMSC-036, ¶ 18.

**{8}** Further, the circumstances described by Defendant do not meet the objective reasonableness standard. *See id.* ¶ 20 (stating that "self-defense is defined by the objectively reasonable necessity of the action" (internal quotation marks and citation omitted)). This inquiry "focuses on the reasonableness of [a] defendant's belief as to the apparent necessity for the force used to repel an attack." *Id.* (internal quotation marks and citation omitted); *see also Coffin*, 1999-NMSC-038, ¶ 12 ("The purpose of recognizing self-defense as a complete justification to homicide is the reasonable belief in the necessity for the use of deadly force to repel an attack in order to save oneself or another from death or great bodily harm."). In this case, reasonable jurors could not have believed that Defendant actually thought it necessary to strangle Victim to death in order to protect himself from an imminent threat of death or great bodily harm, given that he had already restrained and immobilized her for twenty minutes before he chose to tighten the belt around her neck. *See State v. Sutphin*, 2007-NMSC-045, ¶¶ 23-24, 142 N.M. 191, 164 P.3d 72 (holding that a self-defense instruction is not appropriate where the victim threatened the defendant with a pipe and the defendant responded by

repeatedly striking the victim with the pipe even after the victim lost consciousness). Put differently, there was no basis for the jury to conclude that deadly force was necessary to protect Defendant in that moment, and thus, "no basis for the jury to have any doubt that a reasonable person would have found the [killing] to be unnecessary." *See Rudolfo*, 2008-NMSC-036, ¶ 26.

**{9}** Defendant argues that his acts are distinguishable from other cases in which New Mexico courts have deemed a defendant's conduct to be objectively unreasonable because those "defendants acted in ways so extreme that no perceived threat could have justified them." *See, e.g.*, *State v. Lopez*, 2000-NMSC-003, ¶ 26, 128 N.M. 410, 993 P.2d 727 (holding there was insufficient evidence to allow reasonable minds to differ on the objective element where the defendant inflicted fifty-four stab wounds upon the victim and crushed his skull because "[t]hese repetitive, violent actions suggest conduct fueled by hatred or by rage or by other strong emotion, but not by fear"). We disagree. Taking the life of another, in and of itself, is an extreme act; it is justified as self-defense only if necessary to save oneself from death or great bodily harm. *See Coffin*, 1999-NMSC-038, ¶ 12. "The law simply does not recognize any right to an acquittal based on a wholly unreasonable claim of a self-defense justification for taking the life of another." *Rudolfo*, 2008-NMSC-036, ¶ 20. Based on the evidence presented at trial, we conclude that Defendant "did not act reasonably when he killed Victim, and the district court did not err in refusing a self-defense instruction." *See Baroz*, 2017-NMSC-030, ¶ 15.

## II.     Denial of Defendant's Motion to Suppress

**{10}** Defendant also challenges the district court's denial of his motion to suppress statements he made to two border patrol agents at the scene, including his admission to killing Victim. The district court concluded suppression was not warranted because Defendant was not in custody, the questions asked by the border patrol agents did not qualify as interrogation, and Defendant volunteered the information.

**{11}** A district court's denial of a motion to suppress presents a mixed question of law and fact. *State v. Ketelson*, 2011-NMSC-023, ¶ 9, 150 N.M. 137, 257 P.3d 957. "[W]e review any factual question under a substantial evidence standard and we review the application of the law to the facts de novo." *State v. Neal*, 2007-NMSC-043, ¶ 15, 142 N.M. 176, 164 P.3d 57 (internal quotation marks and citation omitted). "[W]e review the facts in the light most favorable to the prevailing party, deferring to the district court's factual findings so long as substantial evidence exists to support those findings." *Id.* (observing that "the district court has the best vantage from which to resolve questions of fact and to evaluate witness credibility").

**{12}** The district court made the following findings in its order on Defendant's motion to suppress. A border patrol agent patrolling in the area observed a minivan on the side of the road with both front doors open. He stopped behind the van and approached, where he discovered Victim dead in the front seat of the van with a belt wrapped around her neck and the seat. He called out to see if anyone else was around but no one

replied. A few minutes later, Defendant emerged from the surrounding desert. The agent did not speak Spanish fluently, but knew enough to ask Defendant for his identification and whether he was a U.S. citizen. Defendant indicated that he was in the country illegally and handed the agent his Mexican passport. The agent instructed Defendant to sit on the ground in between the agent's vehicle and Victim's minivan.

{13}    Another agent who was fluent in Spanish arrived at the scene a few minutes later. The agent asked Defendant about his well-being, if he was hurt because of the car accident. Defendant was stuttering and saying incoherent phrases the agent could not understand. The first agent informed the second agent about the dead woman in the van. Defendant then stated, unprovoked by any additional questioning, that she was going to kidnap and kill his daughter and that he had to do it. The agent then read *Miranda* warnings to Defendant in Spanish and asked whether Defendant understood. Defendant indicated that he did, and thereafter continued to repeat his statements regarding the danger to his family and that he had to kill Victim. Neither of the agents asked Defendant any questions after he was read his *Miranda* warnings.

{14}    On appeal, Defendant focuses on whether he was in custody when he spoke with the border patrol agents. As we understand his argument, he contends that *Miranda* warnings were required at some earlier point in his interaction with the border patrol agents, rendering any of his responses to custodial interrogation inadmissible. We note as an initial matter that Defendant does not specifically identify any particular statements that should have been suppressed, but we infer from his briefing that he believes he was in custody from the moment the first agent told him to sit down, and everything from that point forward should have been excluded.

{15}    Even if we agreed with Defendant that he was in custody at the first moment he admitted to the killing—a matter we do not expressly decide—Defendant did not separately challenge the district court's findings or conclusions that he was not subject to interrogation, and that all of his incriminating statements were voluntary, unprompted, and not made in response to any questioning by the agents. The district court's findings are adequately supported by the agents' testimony at the suppression hearing. Under settled New Mexico law, "the admission into evidence of volunteered statements is not prohibited by the fifth and fourteenth amendments, where there are no facts to indicate that the statement is made in response to interrogation." *State v. Greene*, 1977-NMSC-111, ¶ 28, 91 N.M. 207, 572 P.2d 935 (internal quotation marks omitted); *see also State v. McDowell*, 2018-NMSC-008, ¶ 13, 411 P.3d 337 ("Unsolicited statements, whether they are made before or after an accused is informed of [their] *Miranda* rights, are not protected by *Miranda*."). For these reasons, we conclude the district court did not err in denying Defendant's motion to suppress.

## III.    Denial of Defendant's Request to Correct the Record

{16}    Defendant also asserts that the district court erred in denying his motion to correct an alleged error in the translation of his testimony. According to Defendant, the court interpreter failed to translate a portion of his testimony about a statement Victim

made to him on the day he killed her. Through the court interpreter, Defendant testified, "We were going on the road, . . . we were going down—there was a, a mountain on the right side towards the border. And she said, look . . . how pretty that looks. I would like to walk around there. And look, because this may be the last time you see it in your life." The issue on appeal concerns whether Defendant additionally testified that Victim said he would not see the mountain again "because he was gonna be dead," and whether the court interpreter failed to translate that portion of his testimony. Defendant frames the issue variously as a matter of inadequate translation, as a violation of his right to a qualified interpreter, and a violation of his right to be "linguistically present." Regardless of the framing, it is Defendant's burden to establish the inadequacy of a translation, and if he meets this burden, the district court is required to grant relief. *See State v. Gomez*, 1991-NMCA-061, ¶ 10, 112 N.M. 313, 815 P.2d 166. For the reasons that follow, we affirm the district court's decision to deny Defendant's request to correct the record.

**{17}** The portion of Defendant's testimony at issue occurred on the morning of August 19, 2020, at around 9:52 a.m. The State had rested the day before and Defendant took the stand in his own defense. The following exchange occurred during his direct examination:

> Defense Counsel:    As you were driving down the road, did [Victim] say something to you that scared you?
>
> [Defendant speaking in Spanish]
>
> Court Interpreter:    Yes.
>
> Defense Counsel:    What did she tell you?
>
> [Defendant and Court Interpreter speaking in Spanish]
>
> Court Interpreter:    When we were going on the road, . . .we were going down, there was a mountain on the right, on the right side towards the border and she said, "Look how pretty that looks. I would like to walk around there. And look because this may be the last time you see it in your life."
>
> Defense Counsel:    What did you take that to mean?
>
> [Court Interpreter and Defendant speaking in Spanish]
>
> Court Interpreter:    Well I thought I was gonna die. I thought she was gonna hurt me that day.

Defense counsel asked a few more questions before asking, "When you put the belt around her neck, what were you trying to do?" Defendant began responding to the question and the court interpreter began translating what he was saying as, "She told

me to kill her. She said kill me." Defendant continued speaking, and when he paused, the court interpreter addressed the Court, saying, "[inaudible] requires repetition, your honor. Just to make sure on that point." With the court's permission, the court interpreter spoke with Defendant in Spanish and translated his response as, "Yes, after the belt we were still arguing."

{18}   Defense counsel attempted to revisit the exchange between Defendant and Victim multiple times throughout his direct examination, but Defendant never repeated Victim's statement about the mountain or testified to any exchange where Victim told him he was going to die that day. For example, defense counsel asked Defendant why he thought he was going to be killed, but Defendant merely answered that there was a lot of criminal activity along the border and he had been assaulted in Sonora fifteen years ago. Defense counsel then specifically prompted Defendant to return to his last conversation with Victim and "what she said about dying." Defendant testified, "Yeah, that's when I put the belt on." Defense counsel asked when Defendant became afraid that he was going to die, to which Defendant responded that it was when Victim did not want to stop, or return to El Paso. On cross, the State questioned Defendant regarding any threats made by Victim against him or his family. The State specifically asked Defendant about the conversation about the mountain and whether Victim threatened "to do you any harm in, in the area of that mountain?" Defendant responded, "No."

{19}   At a bench conference during defense counsel's redirect that morning, counsel represented to the district court that the court interpreters were having trouble because Defendant was mumbling and "he often said one thing and then said the exact opposite." When the defense rested later that afternoon, defense counsel stated that he wished to raise an argument about some of the interpretation. Counsel told the court that his understanding of Defendant's testimony "when he talked about [how] he wouldn't be able to see that [mountain] again was that he also said, 'because you'll be dead' and that wasn't interpreted."

{20}   About an hour later, the court interpreter asked to clarify Defendant's statement. Testifying from memory and without reviewing the audio, the court interpreter indicated that when Defendant was asked about when he was on the road with Victim and about the mountains,

> Court Interpreter:     He said that he was on the road and that she asked him to look to the right to see the beautiful, the pretty mountains and, because he was not going to see it again. And then at that point he said, he mumbled something, and the interpreter, I, asked for repetition. He was asked for repetition but he did not repeat the same statement. So, interpreter, I just interpret[ed] what he had said, which he did not repeat the part where he, where she said that she was not, he was not going to see the mountain anymore because he was going to be dead. And so that part was not

repeated from [Defendant] so the interpreter did not repeat that part. He only repeated a small part of it.

District Court: And that part that was mumbled, did you understand anything before he said that?

Court Interpreter: I did not. That's why I asked for the repetition. And then he repeated, and I repeated what he said but not the complete statement previously that he had said.

The district court sought to clarify whether the interpreter heard Defendant say, "because you'll be dead," or whether she heard him mumble. The court interpreter said, "I did hear him say it that . . . that she was saying 'because he was gonna be dead.' But he did not repeat it when he was asked for the repetition. He mumbled something around there and that is why I asked for the repetition."

{21}   After hearing briefly from the parties, the district court asked Defendant to take the stand and allowed defense counsel to voir dire Defendant about what happened. Defense counsel asked Defendant to restate his testimony. Defendant again recounted essentially the same statement that had been translated earlier, saying "We were driving by and saw this thing, this really big thing, pretty, on the side, and wanted to walk, but she said no, you will not see these mountains again." Defense counsel prompted Defendant about whether he had said something beyond that. Defendant stated, "I didn't say anything. She kept on driving the car. But she said because I was going to die that day. That's how she said it to me. That's how she told me." The district court asked why he did not testify to that earlier that day. Defendant responded that he did not remember because he had been "hurt on my head."

{22}   Defense counsel orally requested either a mistrial or that the court reopen the evidence. The district court denied Defendant's oral motion. Overnight, Defendant filed a motion to correct error in the translation. Defendant asserted that he "testified that [Victim] told him he would be dead that day" and that "[t]he [c]ertified interpreter heard the testimony but did not translate it to the jury." The defense did not present any additional evidence with the motion to show that Defendant's testimony was, in fact, erroneously or incompletely translated. *See State v. Cabodi*, 1914-NMSC-009, ¶ 11, 18 N.M. 513, 138 P. 262 ("[W]here it appears that the complaining party is aware at the time, that the interpretation of the evidence is not correct, it is incumbent upon him to call the court's attention to such erroneous translation and ask to have it corrected, and where he has not such knowledge at the time, but afterward becomes aware of the fact, he must set out all the facts in his motion for a new trial, pointing out therein specifically the evidence erroneously translated, and support such contention by affidavit or proof, so that the trial court can intelligently pass upon the question.").

{23}   The district court took up the motion before trial resumed that morning. The court stated that it would play back the portion of the direct examination at issue on the record and asked the certified court interpreter on duty that day to assist with the review. After

the audio played, the interpreter was asked if she could make out the testimony, and she responded that "it was very difficult." The district court asked if they played it back, could she listen to it and see if the interpretation was accurate? She responded that she "would feel uncomfortable judging the interpretation of another interpreter. It would be preferable for the interpreter that took the testimony to be able to explain her interpretation." No other evidence was presented.

**{24}**    The district court denied Defendant's motion to correct the record. The court concluded that based on the court interpreter's testimony the day before, the comment at issue came at the end of a longer statement and was not originally understood by the interpreter. The court observed that the interpreter had asked Defendant to repeat his statement, but he did not. The court concluded this was not an error in interpretation or a statement that was not interpreted; it was a statement that was not understood and Defendant chose not to clarify it when asked to do so. The court observed that Defendant not only had an opportunity to clarify his words when invited to do so by the interpreter, he had a full opportunity to tell his story before the close of evidence. He was asked multiple times about Victim's comments to him, both on direct and cross-examination, but he never testified to the statement at issue. The district court concluded that Defendant's testimony after the close of evidence was different from the testimony he gave before the jury, and was therefore not merely a correction of a simple error in translation.

**{25}**    On appeal, Defendant argues that he met his burden to establish the interpreter provided an incomplete interpretation. We disagree. As Defendant acknowledges in his brief in chief, his original statement was mumbled and the interpreter asked him to repeat his statement *because his words were not clear*. As the district court correctly observed, because Defendant's original statement was not understood by the interpreter and not clarified by Defendant, the court interpreter's translation of the repeated portion of Defendant's testimony does not amount to an error in translation. We agree, and conclude based on the record before us that Defendant has not met his burden to show the interpreter's translation was inadequate. Under the circumstances, Defendant's requested change to the record was not merely a correction of translation, but rather, an attempt to correct Defendant's own failure to clearly testify to a material fact. We affirm the district court's denial of Defendant's motion to correct the record.

## IV.    Cumulative Error

**{26}**    Finally, Defendant asserts that cumulative error requires reversal. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Salas*, 2010-NMSC-028, ¶ 39, 148 N.M. 313, 236 P.3d 32 (internal quotation marks and citation omitted). Having addressed the claims Defendant raises on appeal and found no error, there can be no cumulative error. *See State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 ("Where there is no error to accumulate, there can be no cumulative error." (alteration, internal quotation marks, and citation omitted)).

**CONCLUSION**

**{27}** We affirm.

**{28} IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**ZACHARY A. IVES, Judge**

**GERALD E. BACA, Judge**